UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-50290
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOUGLAS WILLIAM KROUT, a/k/a Mark
William Danford, a/k/a Doug Kraus,
a/k/a Doug Lopez, CYNTHIA ANN VARGAS,
SOLIS HUERTA, SOFIA AGUIRE NANEZ,
ROGELIO ROGER PEREZ ZAMORA, HERIBERTO
HERBERT HUERTA, ROGELIO ROY MEDINA
ARCE, and HECTOR CAMPOS ALVAREZ,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(October 6, 1995)

Before POLITZ, Chief Judge, JONES, and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This is a consolidated appeal arising from the conviction of seven defendants for participating in a continuing enterprise of murder, drug distribution, and firearm offenses as members and conspirators in a Texas prison gang referred to as the "Mexican Mafia." The principal offenses proved at trial involved an elaborate cocaine and heroin distribution scheme within state prisons and on the streets of San Antonio. Most of the inevitable differences among the confederates were resolved by murders either

approved or executed by some of these defendants. Although the evidence adduced at trial was overwhelming,[1] the defendants have raised multiple grounds for reversing their convictions. Of these grounds, the challenges to jury anonymity and the imposition of consecutive sentencing are the most significant. We find no reversible error and affirm.

## I.  Evidentiary Challenges

### A.  Wiretap Evidence

The assorted defendants begin their attack with challenges to the evidence-gathering techniques employed by the government. Specifically, they present three objections to the evidence seized pursuant to court authorized electronic surveillance. Defendants Huerta and Zamora argue that because the terms of the initial wiretap order, entered on September 17, 1992, limited the period of surveillance to ten days, interceptions recorded after these first ten days must be suppressed (as well as the fruits of these conversations).[2] Solis Huerta, Nanez and Alvarez argue that the wiretap applications and affidavits failed to make the required showing that normal investigative procedures were tried and failed or reasonably appeared unlikely to succeed or too dangerous. Finally, Alvarez argues that the interception of

---

[1]    Indeed, the gang's "constitution", introduced into evidence, states in its preamble:  "Being a criminal organization . . . [w]e shall deal in drugs, contract killings, prostitution, large scale robbery [etc.]"

[2]    Defendants Arce, Solis Huerta and Nanez also expressly adopted this argument.

the conversations between Huerta and his wife Solis Huerta violated their expectation of privacy.

The first order entered by the district court is slightly awkward in syntax.[3] Nonetheless, the most plausible reading of the order authorizes interception until either the authorized objectives were obtained <u>or</u> for a period of thirty days, whichever event occurs first. The thirty days, in turn, are measured from "the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered." To read the language of the order otherwise (i.e., with a strict limit of ten days), as the defendants suggest, would impermissibly fail to effectuate the thirty-day period referred to in the termination provision because there are no circumstances in which interception may extend beyond ten days. Moreover, the defendants' argument ignores the intent of the issuing judge who obviously anticipated some significance to the thirty day period since he required ten, twenty, and thirty day progress reports to be filed, and authorized continued interception on any changed phone number occurring within this thirty day window.

Title 18 U.S.C. § 2518(1)(c) and (3)(c) require the applicant for a wiretap order to verify -- and the issuing judge to

---

[3] The order provided that monitoring

shall terminate upon attainment of the authorized objectives as listed above, or, in any event, at the end of thirty (30) days from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Order or ten (10) days after the Order is entered, whichever is earlier.

find -- that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  "What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time."  United States v. Alfonso, 552 F.2d 605, 612 (5th Cir.), cert. denied, 434 U.S. 857 (1977) (quotation omitted).  Here the affidavits contained detailed accounts of the investigative techniques that were used by the agencies investigating the Mexican Mafia.

Specifically, the affidavits asserted that informants or undercover agents could not infiltrate the conspiracy at high enough levels to obtain sufficient evidence to prosecute managers of the organization.  This court has previously affirmed wiretap orders based upon similar affidavits.  See United States v. Guerra-Mares, 928 F.2d 665, 671 (5th Cir.), cert. denied, 112 S.Ct. 322 (1991); United States v. Webster, 734 F.2d 1048, 1055 (5th Cir.), cert. denied, 469 U.S. 1073 (1984).  These affidavits amply established an inability to fully develop a case from informants' knowledge, inability to infiltrate with undercover agents, lack of access to primary targets, the limited value of searches in proving these offenses, and informants' fear and unwillingness to testify.[4]

---

[4]   Alvarez lacks standing to challenge the interception of the Huertas' conversations; he has no constitutionally recognized interest in asserting their privacy rights.  See Alderman v. United States, 394 U.S. 165, 171-72, 176 (1969); United States v. Ruggiero, 928 F.2d 1289, 1303 (2d. Cir.), cert. denied, 112 S.Ct. 372 (1991).

4

## B.  Evidence of Murders

Huerta, Zamora, Solis Huerta and Nanez challenge the admission of evidence about the murders of Rangel, "Chepo" Hernandez, "Pancho" Canales, and the attempted murder of "Tye" Morales.  Huerta and Zamora argue that the evidence was offered to prove bad character in violation of Rule 404(b); all four defendants argue that the evidence was unduly prejudicial.

Yet "[e]vidence of an uncharged offense arising out of the same transactions as the offense charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)."  United States v. Maceo, 947 F.2d 1191, 1199 (5th Cir. 1991), cert. denied, 112 S.Ct. 1510 (1992).  Huerta, Zamora, Arce and Alvarez were charged in the superseding indictment with a RICO offense and RICO conspiracy.  That indictment specifically alleged that members and associates of the criminal enterprise engaged in the actual and threatened use of violence, including murder, to further the objectives of the enterprise, to obtain money, and protect the organization from law enforcement investigations.  These murders and attempted murder were not introduced as character evidence but as acts committed by members of the Texas Mafia in furtherance of the RICO offenses.

The government is not limited in its proof of a conspiracy or racketeering enterprise to the overt or racketeering acts alleged in the indictment.  United States v. Wilson, 657 F.2d 755, 763 (5th Cir. 1981), cert. denied, 455 U.S. 951 (1982).  Morales, Rangel, Hernandez and Canales had all served as "generals"

5

in the Texas Mexican Mafia, commanding the members outside of prison in San Antonio. Evidence of how disputes were settled with these members or how they were treated if believed to be cooperating with law enforcement was properly admitted to prove the allegation in the indictment that murder and extreme violence were part of the organization's pattern of racketeering activities. See United States v. Firestone, 816 F.2d 583, 587 (11th Cir.), cert. denied, 484 U.S. 948 (1987); United States v. Hawkins, 681 F.2d 1343, 1346 (11th Cir.), cert. denied, 459 U.S. 994 (1992).

## C. Coconspirator Testimony

Zamora challenges the district court's admission of two recorded conversations between Rangel's wife, Emily Mendoza, and her son, Edward, in which Mendoza discusses the efforts to kill a bookie, Ramirez, to whom Rangel and Zamora owed money. Zamora argues that because Mendoza was not a conspirator and the statements were not made in furtherance of the conspiracy, these statements were inadmissible hearsay. This court reviews the district court's admission of evidence under Rule 801(d)(2)(E) for abuse of discretion. United States v. Triplett, 922 F.2d 1174, 1181 (5th Cir.), cert. denied, 500 U.S. 945 (1991). The district court's determinations that the statement was made by a coconspirator and in furtherance of the conspiracy are findings of fact reversible only if clearly erroneous. United States v. Stephens, 964 F.2d 424, 434 (5th Cir. 1992).

Although debatable, the district court's decision that Mendoza's comments were made by a coconspirator and in furtherance

6

of that conspiracy were not clearly erroneous. First, Mendoza was with Rangel when he explained the details of the plan to kill Ramirez, and she suggested an improvement to the plan. ("You should have paid Edward instead.") Second, she also attempted to get the job of murdering Ramirez assigned to her son as part of an effort to recruit someone to actually commit the murder that was initially bungled. Although this could be explained as an independent endeavor to find work for her son, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).

In any event, these conversations were merely cumulative of recorded conversations among Rangel, Arce, Zamora and others that indubitably established a conspiracy to murder Ramirez.

## II. Jury Challenges

### A. Jury Anonymity

We next address the appellants' challenge to the procedure employed by the district court in deciding to empanel an anonymous jury, and the substance of the decision that such a device was warranted. The appellants complain that the district court abused its discretion in ordering an anonymous jury by: (1) failing to conduct a hearing; (2) failing to afford appellants an opportunity to refute the allegations in the government's motion for anonymous jury; (3) deciding to select an anonymous jury based solely on the unsworn allegations contained in the government's motion; (4) failing to advise the jury of a neutral or

7

nonprejudicial reason for their anonymous selection; (5) failing to preserve the safeguards of a fair and impartial jury selection; and, (6) because the unusual circumstances that might justify empaneling an anonymous jury were not present in this case.

Anonymous jury empanelment is an issue of first impression in this circuit, but our analysis is guided by the standards developed in other circuits, all of which hold that a lower court's decision to empanel an anonymous jury is entitled to deference and is subject to abuse of discretion review. United States v. Paccione, 949 F.2d 1183, 1192 (2nd Cir. 1991); United States v. Thornton, 1 F.3d 149, 154 (3rd Cir.), cert. denied, 114 S.Ct. 483 (1993); United States v. Crockett, 979 F.2d 1204, 1215-16 (7th Cir.), cert. denied, 113 S.Ct. 1617 (1993); United States v. Daniels, 986 F.2d 451, 454 (11th Cir. 1993) (district court has wide discretion in determining which questions will be asked during voir dire). Accordingly, this court adopts the same abuse of discretion standard of review and will afford deference to a district court's empanelment of anonymous juries.

Keeping this standard in mind, we first reject the appellants' objections to the procedural aspects of the district court's decision. The court provided ample opportunities for the various defendants to state their objections and to develop their arguments. That the court did not follow the exact procedures urged by the defendants on appeal is insignificant.[5] Indeed, only

---

[5] The court found that anonymity would dispel possible fear by jurors for their safety and promote impartial verdicts. To this end, the court ordered a U.S. Deputy Marshal to accompany jurors at recesses and to pick up and drop off jurors

8

Huerta, Zamora and Alvarez filed written objections to the government's motion to empanel an anonymous jury.[6] A conference hearing was also held to discuss the motion, and no appellant objected to the court's failure to pose questions to the venire other than on the subject of their identities.

Moving to the merits of the decision to empanel an anonymous jury, it must be emphasized that this is a drastic measure, which should be undertaken only in limited and carefully delineated circumstances. United States v. Ross, 33 F.3d 1507 (11th Cir. 1994). Courts that have upheld this form of juror protection have reasoned that it is constitutional when needed to ensure against a serious threat to juror safety, if the courts also protect the defendants' interest in conducting effective voir dire and maintaining the presumption of innocence. United States v. Wong, 40 F.3d 1347, 1376 (2nd Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264 (2nd Cir.), cert. denied, 115 S.Ct. 326 (1994); United States v. Paccione, 949 F.2d at 1192. "These competing individual and institutional interests are reasonably accommodated, and the use of an anonymous jury is constitutional when, 'there is

_____

at an undisclosed location at the beginning and end of each day. To attain such anonymity, the court ordered simply that the names, addresses, and places of employment of jurors and spouses would not be disclosed to the parties. The district court also stated that it would provide a neutral explanation for the anonymous status, explaining that it was not the result of any threat by any defendant. While the anonymous status endured throughout the trial, the court did, however, deviate from its intentions in several respects. First, it did not implement the proposed method of transporting jurors, instead allowing them to report directly to the courthouse each day during trial. Second, the court did not explain to the jury their anonymous status. Similarly, the court did not implement a sequestration order entered during trial until the jury began its deliberations.

[6]    The district court, nonetheless, deemed all defendants to have joined any such objection.

strong reason to believe the jury needs protection' and the district court 'tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected'". United States v. Wong, 40 F.3d at 1376 (internal citations omitted). United States v. Vario, 943 F.2d 236, 239 (2nd Cir. 1991), cert. denied, 112 S.Ct. 882 (1992)(when this balance is properly struck, the use of an anonymous jury does not violate the defendant's constitutional rights). Within these parameters, and, again noting the seriousness of such a step, the decision whether or not to empanel an anonymous jury is left to the district court's discretion.

Factors that may justify jury protection by anonymity include: (1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment. United States v. Paccione, 949 F.2d at 1192; United States v. Amuso, 21 F.3d at 1264-65; United States v. Ross, 33 F.3d at 1520. Furthermore, as a caution that use of anonymous juries will remain a device of last resort, it is necessary that the district court base its decision on more than mere allegations or inferences of

10

potential risk.[7]  In accordance with a holding by the Second Circuit, however, the use of anonymous juries will be upheld where evidence at trial supports the conclusion that anonymity was warranted.  United States v. Wong, 40 F.3d at 1376-77 (even if the district court had relied only on the government's proffer, the trial record supports the court's order of anonymity).

All of the above factors were present in this case, and the district court did not abuse its discretion in empaneling an anonymous jury.  Evidence at trial and in wiretap affidavits established that appellants were members and leaders of the Texas Mexican Mafia.  By its written constitution, the organization defined itself as criminals dealing in drugs, contract killings, prostitution, large scale robbery, gambling, weapons, and "in everything imaginable."  One of the group's tenets was to interfere with potential witnesses -- specifically, to murder or attempt to murder members suspected of informing authorities; such acts did occur.  The gang had been linked to dozens of murders in San Antonio from 1990-92.  The organization also sought to corrupt law enforcement authorities to further their goals.  The appellants faced substantial penalties, as Huerta was sentenced to life in prison, Alvarez, Zamora, and Arce received sentences of 300, 360, and 420 months, respectively, and the shortest term of imprisonment imposed on those tried was 120 months.  Finally, prior to trial,

---

[7]     A lesser showing might be adequate where specific evidence exists linking the defendant to organized crime.  Satisfaction of this element alone can, in turn, translate into the requisite showing for the empanelment of an anonymous jury.  United States v. Persico, 832 F.2d 705 (2nd Cir. 1987), cert. denied, 486 U.S. 1022 (1988)(anonymous jury upheld where crime family's normal course of business suggested risk of obstruction and harm).

counsel for several defendants observed, and the district court agreed, that the case had been the subject of much publicity which would likely continue to the case's resolution.[8]

**B.  *Batson* Claim[9]**

After objection, the United States stipulated that of the 11 prospective jurors stricken peremptorily by the government, seven appeared to be of Hispanic ethnicity.  The district court found a prima facie case of discrimination based upon the number of strikes against presumably Hispanic veniremen.[10]  Pursuant to Batson, the court asked the prosecutor to explain the reason for each of the challenged peremptory strikes, and the court was satisfied that there was no purposeful racial discrimination.[11] This court reviews that conclusion under the clearly erroneous standard.  Hernandez v. New York, 500 U.S. 352, 364-365, 369, 111 S.Ct. 1859, 1868-69, 1871 (1991).

The government suggests that this court should not address the merits of the Batson claim.  To be timely, a Batson challenge must be raised before the venire has been dismissed. United States v. Maseratti, 1 F.3d 330, 335 (5th Cir. 1993), cert.

---

[8]    At the close of oral argument in this appeal, a specific issue arose as to whether or not the government during trial inadvertently obtained names and telephone numbers for the jurors in this case.  This court requested the parties to submit further documentation of such allegations and, after careful review of the record, we are convinced that such was not the case.

[9]    Batson v. Kentucky, 476 U.S. 79, 96-98, 106 S.Ct. 1712, 1723-24 (1986).

[10]    The United States believes that eight other persons who might have been Hispanic remained as prospective jurors, and three of them were seated on the jury, while two others became alternate jurors.  Defense counsel at oral argument conceded that at least two seated jurors were of Hispanic origin.

[11]    See n.13 infra for a summary of the reasons given.

12

denied, 114 S.Ct. 1096 (1994). An objection raised after the jury is seated and the venire has been dismissed does not preserve the claim. United States v. Collins, 972 F.2d 1385, 1402 (5th Cir. 1992), cert. denied, 113 S.Ct. 1812 (1993). A proper objection must be made before the venire is excused and leaves the courtroom. Maseratti, 1 F.3d at 335 n.1. The record here is ambiguous concerning the exact sequence of events,[12] but we will assume the objection was timely.

Resolution of the merits of the Batson challenge posed by all defendants is much simpler in light of Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769 (1995). Reversing the court of appeals, which had demanded that a race-neutral explanation be related to the facts of the particular case, the Supreme Court held that all that a prosecutor need offer is a facially valid explanation. Id. at 1771. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id. (citing Hernandez, 500 U.S. at 360 (plurality opinion), 374 (O'Connor, concurring)). Accordingly, a "'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." Id.

---

[12] After the judge read the numbers of the sixteen jurors selected to serve, the district court thanked the other veniremen and instructed them to hand their "juror" buttons to somebody at the back door. He informed them they could be on their way, and according to the record there was a pause as those excused left the courtroom. Next, the district judge ordered the selected jurors to move into the jury box. Only after they had moved into the box, and the court began addressing the jury as selected did defense counsel apprise the court, "We may have a Batson problem." Counsel acknowledged that he needed to raise the issue before losing jurors, but the district court observed, "it's too late to bring them back." The court then proceeded to give preliminary instructions to the jury.

It is unclear whether the veniremen had physically left the courtroom when defense counsel first offered a Batson-objection to the district court.

The district court believed the reasons proffered by the assistant United States attorney were genuine, and nothing in the record has been identified to suggest this credibility evaluation to have been clearly erroneous.[13]

## III.  Procedural Challenges

### A.  Misjoinder, Rule 8

"Improper joinder under Rule 8 is considered to be inherently prejudicial and this is reviewable on appeal as a matter of law." United States v. Bright, 630 F.2d 804, 813 (5th Cir. 1980). This criminal procedure rule authorizes joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Its requirement is satisfied by allegation of an overarching conspiracy that encompasses the substantive offenses charged. United States v. Faulkner, 17 F.3d 745,758 (5th Cir.), cert. denied, 115 S.Ct. 193 (1994). If an indictment charges RICO violations, offenses committed as part of the pattern of

---

[13]    In Purkett, the reason proffered by the prosecution was that the juror had a beard and long hair.  These justifications, held sufficient in Purkett, are the least trial-related explanations proffered in this case:

a.    Jurors 1, 13, and 59 expressed difficulty reading the English language, which prompted concern because of the voluminous transcripts introduced into evidence.  Juror 59 also had a tattoo which could indicate prior affiliation with a gang.

b.    Juror 10's demeanor appeared "lackadaisical," and he laughed at inappropriate times.  Juror 56 also was excused for failure to exhibit an appropriate degree of seriousness.

c.    Juror 94 indicated in his response that the Mexican Mafia sought peace.  Concerned with potential bias, the prosecutor was further troubled by his long hair and a beard.

d.    Juror 100 was excused because of her son's previous experience with juvenile court, and her casual attitude.

racketeering activity are properly joined even if the defendant objecting is not named in the RICO count. <u>United States v. Manzella</u>, 782 F.2d 533,540 (5th Cir.), <u>cert. denied</u>, 476 U.S. 1123 (1986).

Yet Krout notes that he was only indicted for participating in the heroin conspiracy and with the substantive offense of possessing with intent to distribute heroin on March 15, 1993. Citing <u>United States v. Bova</u>, 493 F.2d 33 (5th Cir. 1974), and <u>United States v. Gentile</u>, 495 F.2d 626 (5th Cir. 1974), he reasons that he falls within the rule requiring severance where all of the defendants are charged with offenses arising out of the same series of acts or transactions, <u>but</u> one defendant is additionally charged with an offense <u>which is not alleged</u> to have arisen out of the same series of acts or transactions.

Krout is only partially correct because he ignores <u>United States v. Welch</u>, 656 F.2d 1039, 1049-50 (5th Cir. 1981). This court in <u>Welch</u> held that "the joinder of otherwise separate acts may be allowed when the acts are properly linked by means of a conspiracy charge." <u>Id.</u> at 1051. Significantly, this court expressly decided that "[i]t is true that a RICO conspiracy count can provide the connexity between two otherwise unrelated conspiracies necessary to satisfy the requirements of Rule 8(b)." <u>Id.</u> More importantly, the <u>Welch</u> court adopted the reasoning of the Second Circuit in <u>United States v. Weisman</u>, 624 F.2d 1118 (2d Cir.), <u>cert. denied</u>, 449 U.S. 871 (1980).

15

In <u>Weisman</u>, as in Krout's case, an individual defendant -- Cannatella -- was charged in the indictment with bankruptcy fraud and not in either the securities fraud or any unifying RICO count. Nevertheless, the Second Circuit held (with this court later approving) that the joint trial of Cannatella with the other RICO defendants did not violate Rule 8(b). <u>Welch</u>, 656 F.2d at 1052-1053. Similarly, no error was committed by Krout's joinder in this case.

**B. Severance, Rule 14**

Krout, Nanez, and Solis Huerta all argue that the district court abused its discretion in denying their motions for relief from prejudicial joinder under Fed. R. Crim. P. 14.

Generally, however, persons indicted together should be tried together. <u>United States v. Arzola-Amaya</u>, 867 F.2d 1504, 1516 (5th Cir.), <u>cert. denied</u>, 493 U.S. 933 (1989). A district court should grant a Rule 14 severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro v. United States</u>, 113 S.Ct. 933, 939 (1993). Indeed, neither a quantitative disparity in the evidence nor the presence of a spillover effect requires a severance." <u>United States v. Neal</u>, 27 F.3d 1035, 1045 (5th Cir.), <u>cert. denied</u>, 115 S.Ct. 530 (1994). Normally, limiting instructions to the jury will cure any risk of prejudice. <u>Zafiro</u>, 113 S.Ct. at 938.

16

To reverse for abuse of discretion thus requires a showing of specific and compelling prejudice. <u>United States v. Thomas</u>, 12 F.3d 1350, 1363 (5th Cir.), <u>cert. denied</u>, 114 S.Ct. 1861 (1994). These defendants cannot approach such a showing:

> a. The evidence about Krout's illicit activity was focused and compartmentalized. Presentation of evidence related to his delivery of heroin to Saldana and Munoz was limited to the 11th, 12th and 14th days of trial. Moreover, Krout's opening argument specifically directed the jury's attention to the events of March 15, 1993 and warned against "spillover." The actual disputed factual issues concerning his guilt were simple and limited: whether the surveillance officers could see him deliver a package to Saldana; and whether or not Erasmo Gonzalez's testimony was credible.
>
> b. The extent of Solis Huerta's involvement was also not difficult to separate from the larger universe of evidence. She communicated with her husband Huerta, packaged heroin, and connected Huerta with other gang members by telephone. Nanez's role was similar but she also actively participated in collecting the "dime," and facilitating communications between her father Huerta and other gang members. Both of these defendants also had the testimony presented against them in a block on the 4th, 5th and 6th days of trial.[14]

## IV. **Alvarez's, Krout's, and Arce's Separate Challenges**

### A. **Alvarez**

#### 1. **Evidentiary Challenges**

Alvarez challenges the district court's denial of his motion to suppress evidence obtained pursuant to a search warrant

---

[14] In addition to the court's instruction to consider each defendant's guilt individually, the care and attention of the jury was obvious from the specific and focused notes it sent to the district court throughout its seven day period of deliberations.

Initially, the jury requested an index for the volumes of wiretap transcripts. Subsequently, the jury sent notes concentrating on Hector Alvarez, then about the murder offense involving Arce and Zamora, proceeding to the shipment of heroin to California (implicating Huerta, Solis Huerta, and Nanez), moving onto the testimony of Morales, and culminating with Krout's March 15 transaction. This course of events reflects careful sifting of the evidence, or as the district court observed, they "studied this matter very carefully."

from the residence of Rosa Rubio in San Antonio. Regardless of the merits of his contention about the deficiency of the warrant, Alvarez has no standing to challenge its constitutionality.

Alvarez has the burden of establishing that his own constitutional rights were violated by an unlawful search or seizure. United States v. Wilson, 36 F.3d 1298, 1302 (5th Cir. 1994). Alvarez neither alleged nor offered evidence at the suppression hearing that he had any property or possessory interest in the property searched at 6154 Bark Valley. "In general, a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Wilson, 36 F.3d at 1302. The government alerted Alvarez in its response to his motion to suppress that he had the burden of establishing his expectation of privacy in the premises searched. This court does not deem standing to be waived where "no facts were adduced at the [suppression] hearing from which the government could reasonably have inferred the existence of the defendant's standing." United States v. Cardona, 955 F.2d 976, 982 (5th Cir.), cert. denied, 113 S.Ct. 381 (1992).

Alvarez also challenges, primarily under Fed. R. Evid. 404(b), the admission of two of his prior traffic stops by police officers. During the first stop, on June 11, 1992, Alvarez fled the scene and discarded nine packets of heroin and a handgun. The second stop, which occurred on March 12, 1993, was for driving

18

while intoxicated. Contrary to his assertions, none of the evidence admitted about these two stops was character evidence within the meaning of Rule 404(b).

Rule 404(b) excludes most evidence of extrinsic offenses offered to prove a defendant acted in conformity with his bad character. Uncharged offenses arising from the same transaction or series of transactions charged in the indictment, however, are not barred by the rule. United States v. Maceo, 947 F.2d 1191, 1999 (5th Cir. 1991), cert. denied, 112 S.Ct. 1510 (1992). More specifically, evidence of acts committed pursuant to a conspiracy and offered to prove the defendant's membership or participation in the conspiracy are not extrinsic evidence. United States v. Davis, 19 F.3d 166, 171 (5th Cir. 1994).

Thus, to avoid the strictures of Rule 404(b), all the government need do is suggest a logical hypothesis of the relevance of the evidence for a purpose other than to demonstrate his propensity to act in a particular manner. Here, the prosecutor proposed to introduce evidence of the first traffic stop because it physically associated appellant Alvarez with Victor "Morro" Alvarez, a member of the Texas Mexican Mafia conspiracy. Moreover, it corroborated the testimony of uncharged conspirator Lisa Rubio that these two men were engaged in a drug trafficking operation. Finally, the evidence could also be admissible as an act "part and parcel of the conspiracy itself." The June date of this traffic stop fell within the time period of the offenses charged in the

19

indictment and implicated the same offense conduct and a participant identified in wiretap recordings.

The 1993 stop for DWI was similarly admissible. The evidence at trial was limited to the *fact* of the actual stop and the reason was never provided the jury. The United States limited its proof to the fact that Alvarez was stopped and identified as the driver of a car registered to Lisa Rubio. Not only did the evidence corroborate Rosa Rubio's testimony about the relationship between Lisa Rubio and Victor Alvarez, it also linked Alvarez to Rangel, one of the leaders of the alleged conspiracy, because the same vehicle had been observed by a surveillance officer at Rangel's residence in December, 1992.

### 2. Jury Instruction

Alvarez requested the district court to give the jury a lesser included offense instruction misdemeanor possession of heroin or cocaine, in violation of 21 U.S.C. § 844(a). To be entitled to such an instruction, the elements of the lesser offense must be a subset of the elements of the charged offense. See United States v. Garcia, 27 F.3d 1009, 1014 (5th Cir.), cert. denied, 115 S.Ct. 531 (1994); Schmuck v. United States, 489 U.S. 705, 716 (1989). Indeed, each statutory element of the lesser offense must also be present in the greater offense. United States v. Browner, 937 F.2d 165, 168 (5th Cir. 1991).

The elements of simple possession of a controlled substance are (1) the knowing possession (2) of a controlled substance. Alvarez, however, was charged in Count I with a

20

substantive RICO violation under 18 U.S.C. section 1962(c). Racketeering activities are defined by statute to include "the _felonious_ manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs." 18 U.S.C. § 1961(1)(D)(emphasis added). Simple possession of heroin or cocaine does not even constitute a RICO predicate offense. Counts Two, Four and Five charged Alvarez with conspiracies to commit the substantive offense, and to distribute and possess with the intent to distribute heroin and cocaine. Simple possession is not a lesser included offense of a drug conspiracy, United States v. Rodriguez, 948 F.2d 914, 917 (5th Cir. 1991), cert. denied, 112 S.Ct. 2970 (1992), nor should it be a lesser offense for a RICO conspiracy.

Alvarez also urges that the district court committed reversible error by failing to charge the jury that "mere agreement to commit the predicate acts charged is not sufficient to find the defendant guilty of conspiracy to violate the RICO statute." The trial court's refusal is reviewed for abuse of discretion. United States v. Jensen, 41 F.3d 946, 953 (5th Cir. 1994). Denial of a requested instruction is not error when its substance is implicit in the instructions actually given. United States v. Ramirez, 963 F.2d 693, 705 (5th Cir.), cert. denied, 113 S.Ct. 388 (1992).

The district court's instructions separated the enterprise from the pattern of racketeering activity. And they quite carefully explained each of the elements necessary for

21

predicate offenses, a "pattern," and conspiracy.[15]  Considered as a whole, these instructions did not permit the jury to find a RICO conspiracy solely upon proof that Alvarez agreed to commit the predicate crimes.

### 3.  Statutory Challenge

Alvarez argues that the elements of "pattern of racketeering activity" and activities of an enterprise that "affect interstate or foreign commerce" are both unconstitutionally vague on their face and as applied to him.  This circuit has already specifically rejected the facial challenge to the vagueness of "pattern of racketeering activity."  Abell v. Potomac Ins. Co. of Illinois, 946 F.2d 1160, 1165-67 (5th Cir. 1991), cert. denied, 112 S.Ct. 1944 (1992).  As applied, the statute itself enumerates offenses that qualify as "racketeering activity."  The Supreme Court defined the "pattern" component to require the prosecution to "show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). Hence, Alvarez must argue that the scope of this pattern element "was so unclear that a person of ordinary intelligence in [his]

---

[15]    First, the judge directed the jury that "[t]o prove a pattern of racketeering activity, the government must prove . . . that the acts are related to each other and, two, they amount to or pose a threat of continuing criminal activity."  He then defined what the government must establish to prove the racketeering acts are related to one another:  "[T]he criminal conduct charged embraces criminal acts that have the same or similar purposes, results, participants, victims . . . and are not isolated events."  Next, the district court carefully outlined that the defendant must be linked to the illegal endeavors of the enterprise by participating or "conduct[ing] its affairs: To do so, the government must additionally demonstrate a relationship among the defendant, the pattern of racketeering activity and the enterprise."  He cautioned the jury explicitly, "The defendant and the enterprise cannot be the same."  Finally, the court precisely defined the elements of a RICO conspiracy.

22

position would not have had adequate notice that his actions constituted a pattern of racketeering activity." Abell, 946 F.2d at 1167 (internal quotations omitted). Alvarez was shown to be a member of the Mexican Mafia, an organization officially devoted to criminal activities,[16] which dealt and distributed narcotics, sanctioned murder, and organized an extortionate collection scheme of a "street tax." RICO was certainly intended to encompass these activities designed to further an organized crime enterprise.

Because Alvarez did not truly develop the interstate commerce vagueness argument in his brief, the point is abandoned.[17]

## B. Krout

### 1. Replayed Testimony

The district court denied the jury's request during deliberations to replay the testimony of the officers involved in the surveillance and stop of Krout on March 15. Generally, rereading or replaying testimony is disfavored. United States v. Nolan, 700 F.2d 479, 486 (9th Cir.), cert. denied, 462 U.S. 1123 (1983); United States v. Keys, 899 F.2d 983, 98 (10th Cir.), cert. denied, 489 U.S. 858 (1990). Denial of such a request is proper when the court finds that replaying the testimony would take an inordinate amount of time or create a risk that the jury would place an undue emphasis on that evidence. United States v.

---

[16] Recall, the gang's self-avowed objective was to "deal in drugs, contract killings, prostitution, large scale robbery, gambling, weapons . . ."

[17] We have also considered -- and reject -- Alvarez's argument that there was insufficient evidence to convict him on all counts.

Schmitt, 748 F.2d 249, 256 (5th Cir. 1984), cert. denied, 471 U.S. 1104 (1985).

This request from the jury encompassed four to six hours of testimony.  The parties themselves were unable to focus the request into a more manageable segment of the testimony. Further, because the testimony was audiotaped it would have required redaction prior to playing before the jury.  At this time, the jury had already deliberated into the fifth day, and had previously requested two other lengthy replays of testimony.  No abuse of discretion occurred in denying this request.

**2.  Expert Testimony**

Detective Martinez testified during the playing of three recorded conversations in which "Cowboy" Gonzalez was a participant or was discussed.  The district court denied Krout's objections to questions soliciting the officer's opinion that  references to "the people" and the "driver of the truck" indicated that Gonzalez was acting with others to bring heroin into the area.  Although this court has held that an undercover agent may interpret the "argot or seemingly secret jargon of []alleged criminals," United States v. Fuller, 974 F.2d 1474,1482 (5th Cir. 1992),[18] expert testimony regarding the meaning of ordinary words, which the jury is in as good a position as the 'expert' to interpret, must be excluded. United States v. Allibhai, 939 F.2d 244, 250 (5th Cir. 1991).  Here the excerpts of conversation which Martinez was asked to comment on

_____

[18]    The agent was permitted to explain the term "move around" money means money laundering.

24

were not alleged by the United States to be code -- as is often the case in wiretapped conversations.

Nonetheless, erroneous admission of expert testimony is subject to harmless error analysis. <u>United States v. Weiner</u>, 3 F.3d 17,21-22 (1st Cir. 1993). The testimony objected to by counsel did little to incriminate Krout. First, other evidence introduced at trial established that the "people" referred to in this conversation about the December 28 transaction did not include Krout.[19] Gonzalez's own testimony confirmed this fact. For the exact opposite reason, testimony concerning the March 14 conversation was also harmless to Krout; it was cumulative of other incriminating evidence: Gonzalez testified that Krout delivered the heroin to a Mr. Saldana on March 15. Significantly, this testimony was corroborated by surveillance of the exchange of packages between Krout's and Saldana's vehicles, the seizure of heroin from a box of laundry detergent in Saldana's car, and 1-2 cupfuls of laundry detergent from Krout's Blazer.

### 3. Consecutive Sentencing

Krout's challenge to his sentence, however, merits extended discussion. Krout complains that the district court failed to apply the methodology provided by the commentary to § 5G1.3(c), a policy statement, and that if it had, the district court would have imposed the sentence to run concurrent with a sentence imposed in the Southern District of Texas.

---

[19] Indeed, after Detective Martinez clarified that Krout was not involved in the December 28 transaction Krout's attorney remarked that he "had no problem" with the testimony that Gonzalez was not acting alone.

At sentencing, the district court informed Krout that it would impose the sentence for this offense consecutive to a 97-month term imposed for a prior drug offense in the Southern District of Texas. (Krout was a fugitive when he committed the offenses involved in this case.) Both Krout and his attorney asked the district judge to reconsider this decision, and noted an "objection" for the record. However, Krout's objection offered no particular legal basis.[20] The government contends that Krout's imprecise objection is insufficient to preserve the claimed error for review. We agree.

Krout's objection was in the manner of a simple plea for leniency. Indeed, nothing in Krout's objection gave any indication of the sentencing error now claimed. "A party must raise a claim of error with the district court in such a manner so that the district court may correct itself and thus, obviate the need for our review." United States v. Bullard, 13 F.3d 154, 156 (5th Cir. 1994). By failing to properly object at sentencing, the defendant

---

[20] The record reflects this exchange after the sentence was imposed:

KROUT: Your Honor, could I say one more thing?

COURT: Yes.

KROUT: Could I just ask you to reconsider about running it concurrent with the Corpus Christi? You know, its a very long time away from my family, your Honor.

COURT: The Court will deny that request at this time, Mr. Krout, and the Court will order that the hundred and sixty-eight months on this case run consecutive to the ninety-seven months imposed in the Corpus case. The Court, it will--

FAHLE (Counsel): Your Honor, I'm sorry. I've just two other quick things. I want to make sure that our objection to that is preserved. And, secondly, I would now orally file a notice of appeal, and I'll follow it later with a written notice of appeal.

26

waives his right to full appellate review. This Court will remedy errors so forfeited only in the most exceptional case. <u>United States v. Torrez</u>, 40 F.3d 84, 86 (5th Cir. 1994). In other words, we review only for plain error.[21]

In order to show plain error, the appellant must show that there was an error, that it was plain (meaning "clear" or "obvious") and that the error affects substantial rights. This Court lacks the authority to relieve an appellant of this burden. <u>United States v. Olano</u>, --U.S.--, 113 S. Ct. 1770, 1777-81, 123 L. Ed. 2d 508 (1993). In addition, even when the appellant carries this burden, this Court is not required to correct the error. The Supreme Court has directed that such a forfeited error should be corrected if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." <u>Id.</u> at --, 113 S. Ct. at 1779 (quoting <u>United States v. Atkinson</u>, 297 U.S. 157, 160, 56 S. Ct. 391, 392, 80 L. Ed. 555 (1936)).

In the written judgment of commitment the district court explained its decision to impose consecutive sentences:

> According to U.S.S.G. § 5G1.3, the sentence for the instant offense should result in an appropriate incremental punishment that most nearly approximates the sentence that would have been imposed had both sentences been imposed at the same time. Based upon the purity of the heroin, the defendant's obstructive behavior, and the fact that the defendant was not prosecuted for bond jumping in the Southern District of Texas, the court finds that the consecutive sentence in this case is appropriate.

---

[21] Rule 52(b) of the Federal Rules of Criminal Procedure provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The actual sentence imposed for this offense was at the low end of the guideline range of imprisonment:  168 months in a range of 168-210 months.

Guideline section 5G1.3(c) provides that, in any case other than those covered under subsections (a) and (b),[22] "the sentence for the instant offense shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense." U.S.S.G. § 5G1.3(c), p.s.  The commentary to this section, application note 3, provides that "to the extent practicable, the court should consider a reasonable incremental penalty to be a sentence for the instant offense that results in a combined sentence of imprisonment that approximates the total punishment that would have been imposed . . . had all of the offenses been federal offenses for which sentences were being imposed at the same time."

Although the district court has the ultimate discretion to impose a sentence consecutively, see United States v. Bell, 46 F.3d 442, 446 (5th Cir. 1995), it is required to consider the applicable sentencing guidelines and policy statements.  See 18 U.S.C. §§ 3584(a), (b); 18 U.S.C. §§ 3553(a)(4), (5); United States v. Parks, 924 F.2d 68, 72 (5th Cir. 1991).  In addition, the Supreme Court has held that commentary that interprets or explains

---

[22]  Subsection (a) applies where the defendant committed the instant offense while serving an undischarged term of imprisonment and subsection (b) applies where the conduct resulting in the undischarged term of imprisonment has been taken into account under the relevant conduct provision in determining the offense level for the instant offense.  Appellant and appellee agree that subsections (a) and (b) did not apply in the present case.

a guideline is authoritative. <u>Stinson v. United States</u>, -- U.S.--, 113 S. Ct. 1913, 1915, 123 L. Ed. 2d 598 (1993). In <u>United States v. Hernandez</u>, -- F.3d --, 1995 WL 509345 (5th Cir. 1995), this Court held that a sentencing court is bound to consider § 5G1.3(c) as well as the implications of the methodology suggested by application note 3. "[T]he district court must consider the suggested methodology before determining whether a sentence should run consecutively or concurrently." <u>Id.</u> at *3. The judgment entered by the district court, quoted above, clearly reflects that it considered both § 5G1.3(c) and the commentary to that section.

Krout argues, however, that the district court's failure to apply the methodology provided by the commentary to § 5G1.3(c) was error. We cannot agree. As we noted in <u>Torrez</u>,

> the methodology proposed by note 3 is permissive only. The specific formula . . . is conspicuously preceded by the language "[t]o the extent practicable, the court *should consider* . . . ." This language denotes merely one possible manner of determining the appropriate incremental penalty. Thus, even if the district court had considered this provision, it would have been free to decline to follow the suggested methodology. In other words, the district court would not have violated this provision if it had considered it and then determined that imposing the sentence consecutively provided the appropriate incremental punishment.

40 F.3d at 87 (internal citation omitted). In <u>Hernandez</u>, this Court held that the suggested methodology is advisory only. 1995 WL 509345 at *3. Therefore, failure to apply the methodology provided cannot constitute error.

Krout also argues that the reasons given by the district court for imposing the sentence consecutively were insufficient to justify that decision in light of the policy concerns underlying §

29

5G1.3.  In Hernandez, we held that "[i]f the district court chooses not to follow the methodology, it must explain why the calculated sentence would be impracticable in that case or the reasons for using an alternate method.  Thereafter, the district court is left with discretion to impose a sentence which it believes provides an appropriate incremental punishment."  Id. (internal citations omitted).

Although it is not clear from the district court's judgment why it did not follow the recommended methodology or why it used an alternate method, it is clear that the district court considered the relevant commentary and, with reasons, decided on what it believed to be an appropriate incremental penalty.  We need not decide whether under Hernandez the district court's reasons were insufficient because any error in the district court's judgment could not be considered so "clear" or "obvious" as to be deemed "plain" error.[23]

**C.  Arce**

This court reviews the court's denial of a motion for severance or a motion for continuance for abuse of discretion.  United States v. Dilman, 15 F.3d 384, 393-94 (5th Cir.), cert. denied, 115 S.Ct. 183 (1994)(severance);  United States v. Kelly, 973 F.2d 1145, 1147-48 (5th Cir. 1992)(continuance).  Denial of an eleventh hour or mid-trial motion for a continuance - even when an attorney unfamiliar with the case must take over representation of

---

[23]    We are not saying that the reasons articulated by the District Court would not be proper justification for the imposition of a consecutive sentence under the Hernandez mandated methodology.

a defendant- is not an abuse of discretion.  See United States v. Mitchell, 777 F.2d 248, 255 (5th Cir. 1985), cert. denied, 475 U.S. 1096 (1986).  Arce seeks to establish the requisite "specific and compelling" or "serious" prejudice based upon the ineffective assistance of counsel he received from his first attorney Harrison and based upon Harrison's absences from trial, which allegedly denied him counsel altogether.

This court, however, will not address ineffective assistance of counsel claims on direct appeal except in unusual cases.  United States v. Higdon, 832 F.2d 312, 313-314 (5th Cir. 1987), cert. denied, 484 U.S. 1075 (1988).  Only in that rare instance where the details of the attorney's conduct are "well developed" in the record is such a claim properly considered on direct appeal."  Id. at 314.  Because the record is not definitive about when Harrison's absences were covered by Langlois, we defer to the usual vehicle for resolution of a Sixth Amendment claim, a section 2255 motion.

Finally, to the extent that Arce attempts to find an abuse of discretion in the district court's denial of his motion that is not grounded in effective assistance of counsel, the district court's careful and extended reasoning easily suffices to reject the attack.

## V.   Sentencing Challenges

We have specifically considered each appellant's challenge to the sentence imposed and reject all of their attacks;

every appellant was properly sentenced or the error claimed was harmless.

## CONCLUSION

Having carefully reviewed the contentions advanced by the appellants, we find no reversible error of fact or law.

**AFFIRMED.**