# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-3942

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRIAN K. ELLIS,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 04 CR 22—**Richard L. Young**, *Judge.*

---

ARGUED FEBRUARY 17, 2006—DECIDED AUGUST 22, 2006

---

Before FLAUM, *Chief Judge,* and KANNE and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* After being convicted at trial on three counts of illegal possession of firearms, Brian K. Ellis was sentenced as an armed career criminal to 300 months' imprisonment. He now raises three issues on appeal, including one argument relying on the decision of *Crawford v. Washington*, 541 U.S. 36 (2004). We affirm.

## I. HISTORY

Ellis was pulled over in Gibson County, Indiana, when a police officer noticed him driving erratically. He failed some

initial field sobriety tests, but a field test for the presence of alcohol came up negative. With the officer's prompting, Ellis agreed to go to a hospital to have his blood and urine tested for drugs.

At this point, the officer placed Ellis in custody. An inventory search of the pickup truck Ellis was driving led to the discovery of a loaded .22 caliber revolver on the driver's side floorboard, .22 caliber ammunition scattered throughout, drug paraphernalia, and several cans of beer. The only other passenger, Bradley Ventress, was interviewed and quickly denied ownership of the gun. Ellis, who has a lengthy criminal history including three felony convictions, also disclaimed ownership of the gun.

After undergoing tests at a local hospital, Ellis was released from custody. A warrant was later issued for his arrest on a state DUI charge. That state charge was followed by a federal indictment charging Ellis with unlawful possession of a firearm. Ellis was not interested in facing the warrant or the indictment and apparently went into hiding.

About a month later, police were tipped off that Ellis was at a residence in rural Illinois near the Indiana border. The local authorities made plans to arrest him. Ellis had other plans. As the jury heard, a sheriff's deputy attempted to effect a traffic stop on Ellis after he drove away from the residence, but by the time Ellis's car stopped, it was on fire. He then jumped out of the car with a can of Coleman fuel in his hands, which he used to feed the fire. After dousing the flames and throwing the whole fuel can into the car, Ellis ran into a cornfield. The Illinois State Police was called to assist, and in a matter of hours Ellis was arrested. When taken into custody, he had in his possession a .22 caliber Beretta and a receipt from the retailer Wal-Mart. What the jury did not hear was that before dousing his car with fuel and fleeing the scene, Ellis led authorities on a harrowing

car chase during which he repeatedly fired shots at the police.[1]

Subsequent investigation revealed that the Wal-Mart receipt documented a recent purchase of ammunition. Federal agents traced the receipt to a store in Vincennes, Indiana, where they were able to obtain video footage (later shown to the jury) of Ellis purchasing the ammunition.

Ellis was charged by a superseding indictment with three counts. Counts I and II, both based on the initial traffic stop in Indiana, charged that he was a felon in possession in violation of 18 U.S.C. § 922(g)(1), and a user of a controlled substance in possession of a firearm in violation of § 922(g)(3), respectively. Count III charged that Ellis was a felon in possession in violation of § 922(g)(1) based upon the events leading to his final arrest in Illinois. The indictment also alleged that Ellis would be subject to the fifteen-year mandatory minimum of § 924(e) because of his three previous felony convictions.

A trial was held on all three counts over Ellis's motion to sever Count III. A certified copy of the results of Ellis's blood and urine tests was introduced at trial over Ellis's objection under *Crawford*. The results were introduced as business records to help prove that Ellis was a user of controlled substances. Authentication of these records was established under Federal Rule of Evidence 902(11).[2] The records were admitted during the testimony of the arresting officer. He testified that he took Ellis to the

---

[1] The district court judge granted Ellis's motion in limine to preclude any mention at trial of him shooting at the police. At sentencing, the local sheriff testified to being shot at by Ellis.

[2] Before trial, the government complied with Rule 902(11) and provided written notice of its intent to offer the medical records by a written declaration of the custodian. Ellis did not challenge the authenticity of the records.

hospital and witnessed a lab technician draw blood and Ellis urinate in a cup. He also testified that the results of the urine tests were positive for methamphetamine.

The actual exhibit of medical records admitted at trial contains a number of pages, including a certification of authenticity performed by a laboratory technician at the local hospital. The exhibit also contains two forms filled out at the local hospital, which apparently accompanied Ellis's blood and urine samples. These forms indicate that the "Collector" of the samples was a person with the first name Kristy. These forms were signed by Ellis and had a number of preprinted "Reason[s] for Test." The box checked on Ellis's forms indicates that the reason for his tests was "Reasonable Suspicion/Cause." Furthermore, in the section of one of the forms indicating which tests would be performed, presumably the form accompanying Ellis's blood, there is a handwritten note stating "Blood Drug Screen—Requested by Officer."

The exhibit also includes pages indicating three separate tests of Ellis's samples. An initial test of Ellis's urine was performed by Kristy at the local hospital on the same day Ellis was there. It returned a positive result for methamphetamine. The samples were then apparently shipped out of state to two separate companies for further tests—one for blood and one for urine. Both companies produced documents—dated after Ellis's trip to the hospital—indicating that Ellis had methamphetamine in his system.

The jury convicted on all counts. At sentencing, Ellis, relying on *United States v. Booker,* 543 U.S. 220 (2005), objected to the Presentence Report's conclusion that he should be sentenced as an armed career criminal, and other enhancements, on the basis that the jury had not found all the necessary predicate facts. The judge disagreed. The resultant offense level and criminal history were 34 and VI, respectively, which led to a Guidelines range of 262-327

months' imprisonment. U.S.S.G. § 4B1.4(b)(3)(A) (2004). The judge sentenced Ellis to 300 months' imprisonment.

## II. ANALYSIS

We can easily dispose of two of the issues. First, denial of the severance motion, which we review for abuse of discretion, was not reversible error. *See United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000) (citation omitted). We approved of the joinder of four "discrete, unconnected" felon in possession charges in *United States v. Coleman* by emphasizing that the evidence was neither excessive nor confusing and that an accusation of gun possession is generally not unduly prejudicial to a defendant. 22 F.3d 126, 131-35 (7th Cir. 1994); *see United States v. Walls*, 80 F.3d 238, 242-43 (7th Cir. 1996) (approving the joinder of two unconnected felon-in-possession charges). Here, all three weapons charges "are of like class" as in *Coleman*, and Ellis points to no facts indicating any materially greater prejudice than that we have already considered insufficient to require severance. *See Coleman*, 22 F.3d at 133.

Second, we reject Ellis's invitation to find error in his being sentenced as an armed career criminal on the basis that *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), is no longer good law. This is something we cannot do. *See United States v. Stevens*, 453 F.3d 963, 967 (7th Cir. 2006) (noting that "*Almendarez-Torres* remains intact"); *United States v. Browning*, 436 F.3d 780, 782 (7th Cir. 2006) (explaining that the "continued authority of *Almendarez-Torres* is not for us to decide"); *see also United States v. Williams*, 410 F.3d 397, 402 (7th Cir. 2005) ("[T]he district court does not violate a defendant's Sixth Amendment right to a jury trial by making findings as to his criminal record that expose him to greater criminal penalties.") (citations omitted). There is also no merit in Ellis's argument that the district judge committed error in making

findings of fact to support other enhancements. *See United States v. Dean*, 414 F.3d 725, 727-30 (7th Cir. 2005).

Having dealt with those issues, we are left with Ellis's argument relying on *Crawford* attacking the admission of the medical records establishing the presence of methamphetamine in his system. Evidentiary rulings affecting a defendant's right to confront witnesses are reviewed de novo. *United States v. Gilbertson*, 435 F.3d 790, 794-95 (7th Cir. 2006) (citations omitted). The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him." U.S. Const. amend. VI. As we now know, this right applies only to evidence that is considered "testimonial." *Davis v. Washington*, 126 S.Ct. 2266, 2273-76 (2006). Hearsay evidence that is nontestimonial "is not subject to the Confrontation Clause." *Id.* at 2273. The Supreme Court, however, has expressly declined to provide a comprehensive definition of the term "testimonial." *Davis*, 126 S.Ct. at 2273 (citation omitted); *Crawford*, 541 U.S. at 68.

But we are not without guidance. The prototypical case of testimonial evidence is that created by the civil-law tradition of a judicial officer examining a witness in private and then later reporting the results in court. *Crawford*, 541 U.S. at 43-44. This method was contrary to the common-law tradition of "live testimony in court subject to adversarial testing," but, nonetheless, it was utilized at times by English courts. *Id.* An infamous example of the use of this type of testimonial evidence is the treason trial of Sir Walter Raleigh. *Id.* at 44. The crucial evidence used against Raleigh was the statement of an alleged accomplice implicating Raleigh. Despite Raleigh's cry to "[c]all my accuser before my face," the statement was not given by way of live testimony. *See id.* (citing *Raleigh's Case*, 2 How. St. Tr. 1, 15-16 (1603)). Instead, it was introduced in the form of a letter that was created during a pretrial examination of the

accomplice. As the Court in *Crawford* explained, this method of producing and introducing evidence was the "principal evil at which the Confrontation Clause was directed." *Id.* at 50. Accordingly, when the Court later provided guidance as to what constitutes testimonial evidence, it explained, "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68.

On the other end of the spectrum, the Court in *Crawford* explicitly noted, quite importantly for this case, that business records "by their nature were not testimonial." *Id.* at 56; *see also id.* at 75 (Rehnquist, C.J., concurring in judgment) (noting the majority had excluded business records from the definition of testimonial evidence). Thus, it is clear that statements embodied in a business record are nontestimonial. *Id.*

The disputed tests were introduced as a business record under Federal Rules of Evidence 803(6) and 902(11), and we note that Ellis has advanced no argument here or objection below under those rules. His only claim of error is under *Crawford*. Neither his argument here nor his objection below were particularly well-developed. Nevertheless, we will construe his argument as one directed not only to the business records themselves, but also to the certification of those records pursuant to Rule 902(11). We will consider these in turn.

### A. The Business Records of the Underlying Medical Tests

Faced with the obvious obstacle of the Court's designation of business records as nontestimonial, Ellis attacks the underlying medical records by arguing that they were created not because of routine medical procedures, but

because of a government investigation. What we gather from this argument is that most business records would by their very nature have been created *prior* to any investigation of criminal activity, and that these are the type of business records the Court had in mind. The records used against Ellis, however, might be considered testimonial because they were created under police supervision and *during* an investigation for the purpose of determining whether a crime had been committed.

Whether a statement was made with an eye toward prosecution, that is, with the knowledge or for the purpose that it would be used later for prosecution, is an important aspect of delineating between testimonial and nontestimonial evidence. Two of the possible definitions of testimonial provided by the Court in *Crawford* focus on this circumstance. *See Crawford*, 541 U.S. at 51-52 ("*ex parte* in-court testimony or its functional equivalent . . . that declarants would reasonably expect to be used prosecutorially" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (citations omitted). And the courts of appeals have taken to defining testimonial in terms of whether the declarant reasonably expected the statement to be used prosecutorially. *E.g., United States v. Maher*, 454 F.3d 13, 21 (1st Cir. 2006) (holding a statement to be testimonial because "it [was] clear that an objectively reasonable person in [the declarant's] shoes would understand that the statement would be used in prosecuting [the defendant] at trial"); *United States v. Hinton*, 423 F.3d 355, 359 (3d Cir. 2005) (explaining that statements are testimonial when "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial") (citations and quotations omitted); *United States v. Cromer*, 389 F.3d 662, 673-74 (6th Cir. 2004) (explaining that a statement is

testimonial when "a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime"); *United States v. Saget*, 377 F.3d 223, 228-29 (2d Cir. 2004) ("*Crawford* at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial."); *see also* Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1042-43 (1998) (defining a testimonial statement as one made when the declarant "anticipates that the statement will be used in the prosecution or investigation of a crime").

We, in fact, have previously rejected a *Crawford* argument on the basis that the challenged statements (certified certificates of vehicle titles, including odometer statements used to prove fraud) were "not testimonial because they were not made with the respective declarants having an eye towards criminal prosecution." *United States v. Gilbertson*, 435 F.3d 790, 795-96 (7th Cir. 2006) (citing *Crawford*, 541 U.S. at 56 n.7).

Given the focus of the courts of appeals and our own precedent on the declarant's reasonable expectations of whether a statement would be used prosecutorially, Ellis may appear to be on strong ground in arguing that the results of his medical tests were testimonial. It must have been obvious to Kristy (the laboratory technician at the local hospital) that her test results might end up as evidence against Ellis in some kind of trial. After all, she indicated on the form that the reason for the tests was "Reasonable Suspicion/Cause." Moreover, the police officer's participation in initiating these tests—the officer accompanied Ellis to the hospital and even watched him urinate in a cup—would also have led Kristy to believe that her test results would be used for criminal prosecution. The same might go for the professionals performing the tests out of

state. The forms which we assume accompanied the samples bore the ominous "Reasonable Suspicion/Cause" indication checked by Kristy, and the blood sample form also had the notation that it was "Requested by Officer."

Nevertheless, we do not think these circumstances transform what is otherwise a nontestimonial business record into a testimonial statement implicating the Confrontation Clause. There is no indication that the observations embodied in Ellis's medical records were made in anything but the ordinary course of business. Such observations, the Court in *Crawford* made clear, are nontestimonial. 541 U.S. at 56. And we do not think it matters that these observations were made with the knowledge that they might be used for criminal prosecution. Prior to the Court's decision in *Davis*, two other courts of appeals decided that certificates of nonexistence of record ("CNR"), admitted under Rule 803(10) and used to prove an alien did not receive permission from the Attorney General to reenter the country, were nontestimonial despite the fact they were prepared by the government in anticipation of a criminal prosecution. *See, e.g.*, *United States v. Cervantes-Flores*, 421 F.3d 825, 833 (9th Cir. 2005); *United States v. Rueda-Rivera*, 396 F.3d 678, 680 (5th Cir. 2005). The focus of these decisions was that the preparation of these CNRs was routine, and the statements in them were simply too far removed from the examples of testimonial evidence provided by *Crawford*. *Cervantes-Flores*, 421 F.3d at 833-34; *Rueda-Rivera*, 396 F.3d at 680.

We agree with these courts that the mere fact a person creating a business record (or other similar record) knows the record might be used for criminal prosecution does not by itself make that record testimonial. The Court's recent decision in *Davis* (though we recognize the Court made no such pronouncement) supports this conclusion because we think it necessarily rejects a strict adherence to denominating as testimonial all statements made

under circumstances where a reasonable person would know the statements might be used as evidence of a crime.

In *Davis,* the Court addressed a statement made by a woman to a 911 operator reporting she had been assaulted. 126 S.Ct. at 2270-71. That recorded statement was later used at trial to prosecute Davis (the woman's former boyfriend) for a felony violation of a domestic no-contact order. *Id.* at 2271. The Court considered the 911 operator's questioning of the woman to be an interrogation, *id.* at 2274 n.1, and the operators themselves to be at least "agents of law enforcement," *id.* at 2274 n.2. In the face of Davis's objection that introduction of the statement violated the Sixth Amendment, the Court held that when the objective circumstances indicate the "primary purpose" of police interrogation is to meet an ongoing emergency, the statements elicited in response are nontestimonial. *Id.* at 2273-74. We believe this holding necessarily implies that consciousness on the part of the person reporting an emergency (or the police officer eliciting information about the emergency) that his or her statements might be used as evidence in a crime does not lead to the conclusion ipso facto that the statement is testimonial. A reasonable person reporting a domestic disturbance, which is what the declarant in *Davis* was doing, will be aware that the result is the arrest and possible prosecution of the perpetrator. *See, e.g.,* Richard D. Friedman & Bridget McCormack, *Dial-In-Testimony*, 150 U. Pa. L. Rev. 1171, 1199 (concluding that most 911 callers know that by reporting domestic violence "they are practically ensuring that the other person will be arrested, and that a criminal prosecution will probably follow"). So it cannot be that a statement is testimonial in every case where a declarant reasonably expects that it might be used prosecutorially.[3]

---

[3] The justice dissenting in the Supreme Court of Washington's ruling in *State v. Davis* found the statements to be testimonial in

(continued...)

While the medical professionals in this case might have thought their observations would end up as evidence in a criminal prosecution, the objective circumstances of this case indicate that their observations and statements introduced at trial were made in nothing else but the ordinary course of business. Therefore, when these professionals made those observations, they—like the declarant reporting an emergency in *Davis*—were "not acting as . . . *witness[es]*;" and were "not *testifying*." *See Davis*, 126 S.Ct. at 2277 (emphasis in original). They were employees simply recording observations which, because they were made in the ordinary course of business, are "statements that by their nature were not testimonial." *Crawford*, 541 U.S. at 56.

## B.  Certification Pursuant to Rule 902(11)

Prior to *Crawford*, we held that Rule 803(6) remained a firmly rooted exception to the hearsay rule, and, therefore, did not violate the Confrontation Clause despite the then-recent amendment allowing authentication by written certification pursuant to Rule 902(11). *See United States v. Klinzing*, 315 F.3d 803, 809-10 (7th Cir. 2003). The question we must answer in the wake of *Crawford* is whether a written certification attesting to the authenticity of a business record is testimonial evidence. *Davis*, 126 S.Ct. at 2274-76. We do not think it is.

---

[3] (...continued)
large part because the 911 caller had to have known her call would be used prosecutorially. 111 P.3d 844, 853 (Wash. 2005) ("[I]t is clear that a reasonable person in [the declarant's] position would have known that her 911 call would have resulted in Davis' prosecution and that the information relayed in the call would be used in that prosecution.") (Sanders, J., dissenting).

As should be clear, we do not find as controlling the fact that a certification of authenticity under 902(11) is made in anticipation of litigation. What is compelling is that *Crawford* expressly identified business records as nontestimonial evidence. *Crawford*, 541 U.S. at 56. Given the records themselves do not fall within the constitutional guarantee provided by the Confrontation Clause, it would be odd to hold that the foundational evidence authenticating the records do. We also find support in the decisions holding that a CNR is nontestimonial. *See, e.g., Cervantes-Flores*, 421 F.3d at 833; *Rueda-Rivera*, 396 F.3d at 680. A CNR is quite like a certification under 902(11); it is a signed affidavit attesting that the signatory had performed a diligent records search for any evidence that the defendant had been granted permission to enter the United States after deportation. *Cervantes-Flores*, 421 F.3d at 831; *Rueda-Rivera*, 396 F.3d at 679.

The certification at issue in this case is nothing more than the custodian of records at the local hospital attesting that the submitted documents are actually records kept in the ordinary course of business at the hospital. The statements do not purport to convey information about Ellis, but merely establish the existence of the procedures necessary to create a business record. They are made by the custodian of records, an employee of the business, as part of her job. As such, we hold that the written certification entered into evidence pursuant to Rule 902(11) is nontestimonial just as the underlying business records are. Both of these pieces of evidence are too far removed from the "principal evil at which the Confrontation Clause was directed" to be considered testimonial. *Crawford*, 541 U.S. at 50.

## III.  CONCLUSION

For the foregoing reason, Ellis's convictions and sentence are AFFIRMED.

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*