IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 17, 2007

Charles R. Fulbruge III
Clerk

No. 06-20634

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

LINDA MORGAN

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before DENNIS[*], CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:

Linda Morgan appeals her conviction.  We AFFIRM.

## I. FACTS AND PROCEEDINGS

On September 6, 2005, Linda Morgan was indicted on twelve counts of health care fraud, in violation of 18 U.S.C. § 1347, and one count of conspiracy, in violation of 18 U.S.C. § 371.  Before trial, the government filed a notice of Federal Rule of Evidence 404(b) material and/or impeachment evidence, including evidence of Morgan's activity at Compass Bank. The government also filed a notice of intent to offer affidavits for certain records under Federal Rule of Evidence 902(11), including the use of Victor Davies's grand jury testimony

---

[*] Judge Dennis concurs in the judgment only.

transcript for the admission of patient beneficiary records. Morgan made motions in limine to exclude extrinsic bad act evidence under Rule 404(b) and use of Davies's grand jury testimony, and she objected to the authenticity of the documents obtained from Davies in the grand jury. The district court denied the motion to exclude the business records obtained from Davies in the grand jury.

At trial, the government established that Medicare required that a patient be seen face-to-face by a treating physician before any durable medical equipment was prescribed. Also, a Certificate of Medical Necessity ("CMN") needed to be completed. CMNs were Department of Health and Human Services forms that contained patient information, a physician attestation, and information about the equipment provided. Morgan was listed as the treating physician and her signature appeared on the CMNs associated with counts one through twelve of the indictment.

Seven of the Medicare beneficiaries named in these CMNs testified at trial. While residing in Louisiana or Texas, they or their spouses were approached by marketers—none of whom were Linda Morgan—about obtaining a wheelchair or scooter. They provided their Medicare and/or Medicaid insurance cards and identification to the marketers who copied them on a portable copier. All seven witnesses testified that they had never seen, met, or been treated by Morgan. Five of the witnesses were asked on direct-examination whether they needed a wheelchair to move around their residences and how much time they spent in a wheelchair each day. All five witnesses testified that they did not need a wheelchair to move around their residences and spent no time in wheelchairs. However, the CMNs associated with those five witnesses each indicated that they needed a wheelchair to move around their residences and that they spent eight hours in a wheelchair each day.

Peggy Miller of Palmetto GBA ("Palmetto") testified that Palmetto processed claims for durable medical equipment for Medicare. Durable medical

equipment claims were paid when the companies providing the equipment provided documentation to billing companies that transmitted the information to Medicare for payment. Palmetto did not see the documentation for the bills, and the billing companies did not vouch for the accuracy of the billing they did on behalf of the equipment provider. Miller also testified that Morgan wrote Medicare in Oklahoma City a letter dated February 26, 2002, to advise them that she was moving to Texas and giving up her unique physician identification number that state medical associations used to track medical services. Morgan's number was deactivated effective May 31, 2002, making her ineligible to be paid through Medicare in Oklahoma.

Miller testified that based on the testimony of the previous witnesses approached for durable medical equipment, Morgan would not be considered a treating physician under Medicare. She could not be a treating physician because she had not seen any of the patients and had not established a diagnosis or course of treatment. Also, Medicare did not pay claims for services provided by physicians who were not licensed in the state where the patient lived or where the treatment took place. Other witnesses had testified that Morgan was not licensed to practice medicine in Louisiana or Texas. However, Miller explained that during 2003 and 2004, the years at issue, Medicare did not check to see if physicians were licensed in the state of residence of the patient whose treatment or equipment was being billed.

Prince Yellowe was in detention pending resolution of health care fraud and other federal criminal charges when he testified at Morgan's trial. Yellowe first became involved in durable medical equipment through the owner of a company billing for motorized wheelchairs, which paid a substantial profit. Yellowe began selling durable medical equipment and used marketers to recruit Medicare recipients who wanted motorized wheelchairs. The marketers would obtain the recipient's information to submit for billing.

Yellowe was introduced to Morgan during 2003. He offered to pay her $250 per prescription that she filled out for Medicare recipients and for filling out other paperwork required for claims. Yellowe paid Morgan in cash once or twice a week. Yellowe brought her patient information on ten to forty patients each time he saw her, but he never took a patient to see her. He handled between 800 and 1000 of Morgan's prescriptions during his relationship with her and paid her between $150,000 and $200,000. Yellowe was familiar with Morgan's signature and identified it on the exhibits associated with counts one through twelve of the indictment.

After he met Morgan, Yellowe became involved with an individual named Victor Davies. Yellowe agreed to provide Davies with prescriptions that he obtained, mostly from Morgan. He charged Davies between $900 and $1200 for prescriptions for which he was paying Morgan $250. Yellowe contracted with Davies to do the billing for his company, Rovic Medical Supply.

Denise Scott, a Special Agent with the Department of Health and Human Services, Office of Inspector General, testified that she interviewed Morgan three times. Morgan told Scott that she was not a licensed physician in the state of Texas because she failed to pass the examination. She admitted that she prepared and sold claim forms to Yellowe for Medicare beneficiaries, and she admitted that she had never seen the beneficiaries for whom she had been preparing forms. Scott identified Morgan's signature on claim forms associated with counts seven, eight, nine, and eleven of the indictment. Morgan told Scott that she had received $40,000 from Yellowe. When Scott told Morgan that Medicare had paid millions of dollars in claims on prescriptions with her physician number, Morgan responded, "I should have been paid more."

Government exhibits indicated that from January 2003 through December 2004, $24,076,103.93 in claims were submitted using Morgan's physician identification number. Medicare paid $7,961,885.27 of those claims.

At the close of the government's case, Morgan moved for a judgment of acquittal which was denied.

Morgan testified that she was not licensed to practice medicine in Louisiana or Texas, but she was licensed to practice medicine in Oklahoma. She testified that she did not sign the documents associated with counts one through twelve of the indictment, although she admitted that she did write some prescriptions without seeing patients.

On cross-examination, Morgan testified that the prescriptions associated with counts one through twelve of the indictment were on preprinted forms from her clinic in Oklahoma. In response to a question about whether she had been paid $100,000 for seeing patients while she was unlicensed in Texas, Morgan claimed that some of the patients were from Oklahoma. In response to the follow-up question of whether she saw them in Texas, Morgan responded, "No, I saw them close to the line of Oklahoma." When asked if she knew which side of the line she was on, Morgan responded, "I don't know exactly in relationship whether it was to the left or to the right of the line." Morgan denied signing prescription forms that had been shown to her by Scott.

After questioning Morgan about the charges in the indictment, the government continued to cross-examine her about pretrial release conditions requiring her to refrain from opening any new bank accounts. Morgan admitted that she met her daughter at Compass Bank one day and that she endorsed a check for approximately $179,000 on that visit but denied depositing it and denied opening a new account.

The government called a rebuttal witness, Daniel Wu of Compass Bank, who testified that Morgan and her daughter met with him on October 24, 2005 when Morgan asked him to close two business accounts, to open a new business account, and to transfer the funds from the old accounts into the new account. The new account carried the same name as one of the closed accounts, and

Morgan's daughter was to be the signatory. Over a defense objection, Compass Bank records were admitted which included a signature card with Morgan's daughter's name and a copy of a check for $172,506. Wu identified the check as the instrument that was deposited on October 24, 2005, stated that Morgan had handed him the check and stated that he was present when she endorsed it. Morgan told Wu to only put her daughter's name on the new account. Wu testified, "[Morgan] said to make sure that I remembered who she was so that when she took care of her personal matters, that she could—so that I could add her to this new account."

The defense renewed its motion for a judgment of acquittal which was denied.

Morgan was convicted on all thirteen counts and sentenced to 120 months of imprisonment. On appeal, she claims the use of Davies's grand jury testimony to authenticate business records and the admission of the business records at trial violated her rights under the Confrontation Clause. She also claims the district court erred in admitting evidence of an extrinsic offense and challenges her conviction on the grounds of insufficiency of evidence.

## II. DISCUSSION

A. Use of Grand Jury Testimony to Authenticate Business Records

(1) Standard of Review

Morgan claims that the use of Davies's grand jury testimony to authenticate the business records used against her at trial violated the Confrontation Clause of the Sixth Amendment. This Court reviews de novo a timely Confrontation Clause objection, subject to harmless error analysis. United States v. Acosta, 475 F.3d 677, 680 (5th Cir. 2007).

(2) Applicable Law

The Confrontation Clause gives the accused in a criminal prosecution the right to be confronted by the witnesses against him. In Crawford v. Washington,

the Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68 (2004). The Court declined to define "testimonial," but it determined that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. The statements at issue in Crawford were admitted at trial. Id. at 40.

"Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . . In making its determination it is not bound by the rules of evidence except those with respect to privileges." FED. R. EVID. 104(a). In Bourjaily v. United States, the Court upheld the district court's consideration of hearsay during its preliminary determination on the admissibility of evidence under Rule 104(a). 483 U.S. 171, 174, 178 (1987).

(3)    Analysis

This issue centers on whether the Confrontation Clause provides the same protections to defendants at preliminary proceedings as it does at trial under Crawford. Crawford specifically defines grand jury testimony as testimonial in nature. 541 U.S. at 68. Davies's grand jury testimony was used as the basis for authentication by the district court in its determination that the business records in exhibits one through twelve were admissible at trial. Davies was unavailable for trial, and he was not cross-examined before the grand jury.

Before Crawford, this Court held that a defendant was not denied his Confrontation Clause right when the government did not release the identity of an informant or the information supplied by the informant at a suppression hearing. United States v. De Los Santos, 810 F.2d 1326, 1334–35 (5th Cir. 1987). This Court has also held that the admission of a certificate of the absence of public records at trial did not violate the Confrontation Clause. United States v.

7

Mix, 446 F.2d 615, 621–23 (5th Cir. 1971). Since Crawford, this Court has held that "there is no Crawford violation when hearsay testimony is used at sentencing, rather than at trial." United States v. Beydoun, 469 F.3d 102, 108 (5th Cir. 2006).

While the Fifth Circuit has not decided whether Crawford applies to pretrial proceedings and determinations, the Seventh Circuit has held that a written certification attesting to the authenticity of business records is not testimonial. United States v. Ellis, 460 F.3d 920, 927 (7th Cir. 2006). That court reasoned that since the Supreme Court had identified business records as nontestimonial, "it would be odd to hold that the foundational evidence authenticating the records [falls under the Confrontation Clause]." Id. The Ninth Circuit similarly held that the routine certifications provided for public records were not testimonial in nature. United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). That court reasoned that such a certification was a "routine cataloguing of an unambiguous factual matter." Id. (internal quotation omitted). The Ninth Circuit further reasoned that "requiring the records custodians and other officials from the various states and municipalities to make themselves available for cross-examination in the countless criminal cases heard each day in our country would present a serious logistical challenge without any apparent gain in the truth-seeking process." Id. (internal quotation omitted).

Based upon pre-Crawford precedent, this Court's decision that Crawford does not apply to sentencing, and persuasive authority from the Seventh and Ninth Circuits, we hold that Crawford does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence.

B.    Admission of Business Records

Morgan claims that the admission of the business records provided by Davies to the grand jury violated her rights under the Confrontation Clause. The standard of review is again de novo. Acosta, 475 F.3d at 680.

In Crawford, the Court noted that business records are not testimonial in nature. 541 U.S. at 56. Based upon that portion of Crawford, this Court has held that public records are not testimonial in nature. United States v. Lopez-Moreno, 420 F.3d 420, 437 (5th Cir. 2005). This Court has held that Crawford does not extend to the admission of a certificate of nonexistence of record from the Immigration and Naturalization Service. United States v. Rueda-Rivera, 396 F.3d 678, 678–80 (5th Cir. 2005). Because of this clear precedent, we hold that, after Crawford, business records are not testimonial in nature and their admission at trial is not a violation of the Confrontation Clause.

## C.    Admission of Evidence of an Extrinsic Offense

### (1)    Standard of Review

This Court "review[s] a district court's evidentiary rulings for abuse of discretion" subject to harmless error analysis. United States v. Cantu, 167 F.3d 198, 203 (5th Cir. 1999). "[F]or any of the evidentiary rulings to be reversible error, the admission of the evidence in question must have substantially prejudiced [the defendant's] rights." United States v. Sanders, 343 F.3d 511, 519 (5th Cir. 2003).

### (2)    Applicable Law

This Court has held that "[w]hether Rule 404(b) or Rule 608(b) applies to the admissibility of other-act evidence depends on the purpose for which the prosecutor introduced the other-acts evidence." United States v. Tomblin, 46 F.3d 1369, 1388 (5th Cir. 1995). Rule 404(b) applies when extrinsic evidence is offered "as relevant to an issue in the case, such as identity or intent." Id. Rule 608(b) applies when extrinsic evidence is "offered to impeach a witness, to show the character of the witness for untruthfulness." Id. (internal quotation omitted).

9

This Court employs a two-prong test to examine the admissibility of extrinsic evidence under Rule 404(b). Sanders, 343 F.3d at 517–18. First, the Court must determine whether the extrinsic evidence is relevant to an issue other than the defendant's character, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. at 518. "Second the evidence must possess probative value that is not substantially outweighed by its undue prejudice . . . ." Id. (internal quotation omitted). Rule 404(b) also requires that the government give notice to the defendant of the use of extrinsic evidence. The government did provide notice of the evidence regarding Morgan's activity at Compass Bank.

However, "[a] defendant makes his character an issue when he testifies." Tomblin, 46 F.3d at 1388. Rule 608(b) provides that:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness . . . .

FED. R. EVID. 608(b). The rule "authorizes inquiry only into instances of misconduct . . . such as perjury, fraud, swindling, forgery, bribery, and embezzlement." Tomblin, 46 F.3d at 1389 (internal quotation omitted). The government "may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." Id. at 1388 (internal quotation omitted).

(3)    Analysis

Morgan claims that the district court erred in admitting over objection Wu's testimony and Compass Bank records on rebuttal. Because Morgan testified, her character for truthfulness became an issue allowing the government to question Morgan about specific instances of misconduct on cross-

examination under Rule 608(b). Morgan's violations of the conditions of her pretrial release rise to a level of dishonest conduct sufficient to allow the government's inquiry. However, Rule 608(b) does not allow extrinsic evidence of specific instances of misconduct outside of cross-examination and could not be the basis for admission of Wu's rebuttal testimony or the bank records. That evidence could only be admitted if allowed under Rule 404(b).

In United States v. Mortazavi, this Court held that rebuttal testimony originally offered to impeach the defendant was admissible as substantive evidence of intent under Rule 404(b). 702 F.2d 526, 528 (5th Cir. 1983). This Court reasoned that an undercover agent's testimony of a prior attempt by the defendant to deal drugs nine years earlier was on point in proving the defendant's intent, as it contradicted his direct testimony that he lacked any intent to deal drugs. Id. at 527–28. Therefore, the testimony was admissible as substantive evidence, not just as impeachment evidence. Id. at 528.

In United States v. Jensen, this Court held that documentary evidence of extrinsic offenses that was not admissible under Rule 608(b) was admissible under Rule 404(b). 41 F.3d 946, 958 (5th Cir. 1994). The documents were evidence of extrinsic false statements on a bankruptcy document and a false tax return. Id. at 957. Jensen was charged as part of a massive loan fraud scheme. Id. at 952. The Court reasoned that since the defendant's theory "was that he lacked a culpable state of mind and did not intentionally mislead people," the documents were properly admitted to rebut the defense of lack of intent. Id. at 958.

Morgan's defense was also that she lacked the intent to defraud. In closing, defense counsel relied heavily on the theory that the others in the conspiracy would not have involved her in the scheme. Also, Morgan testified that her signature on exhibits one through twelve were forgeries. Wu's testimony and the Compass Bank records were similar to the extrinsic evidence

admitted in Jensen. Documents indicating extrinsic false statements by Jensen rebutted his lack of intent defense. Evidence of Morgan's attempt to circumvent pretrial release conditions by concealing her opening of a new bank account by using her daughter's name rebutted her defense that she lacked fraudulent intent. Also, Morgan's apparent perjury at trial proved fraudulent intent as to the underlying scheme for which she was on trial.

Wu's testimony also indicated that Morgan had knowledge of how to commit fraud. She approached Wu with her daughter to open an account and made certain that Wu knew who she was so that she could later have access to that account. Such knowledge of how to circumvent signature requirements rebutted her testimony that she had not signed the forms associated with counts one through twelve. Even if she had not signed the forms, her activity at Compass Bank proved that she knew how to benefit from the use of her identity without fully disclosing it.

Wu's testimony also fell short of being substantially prejudicial. While the jury saw Morgan's testimony directly contradicted by Wu, such a contradiction would have been probative of her intent and knowledge. The probative value of Wu's testimony and the bank records do not appear to be substantially outweighed by undue prejudice. The district court did not abuse its discretion in admitting Wu's testimony and the Compass Bank records under Rule 404(b).

D.    Sufficiency of Evidence

(1)    Standard of Review

This Court reviews "de novo the district court's denial of a properly preserved motion for judgment of acquittal." United States v. Fuchs, 467 F.3d 889, 904 (5th Cir. 2006).

> In determining whether there was sufficient evidence to sustain [the] convictions, we must decide, viewing the evidence and the inferences therefrom in the light most favorable to the verdict, whether a rational juror could have found [the defendant] guilty

beyond a reasonable doubt. The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. Moreover, our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct.

Id. (internal quotations and citations omitted) (alterations in original).

(2)   Applicable Law

18 U.S.C. § 1347 provides that:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

(3)   Analysis

Morgan was not licensed to practice medicine in Louisiana or Texas, and Medicare in Oklahoma would no longer pay her since she gave up her physician identification number. At the time of the offenses charged, Medicare was not auditing to determine if doctors prescribing equipment were licensed in the state where they were seeing patients. Seven witnesses testified that they had been approached to receive durable medical equipment and that they provided their Medicare and/or Medicaid billing information to receive that equipment. Morgan was listed as the physician on the prescription and CMN for each witness. None of the witnesses had seen Morgan. Five witnesses testified that information on their CMNs claiming that they needed a wheelchair was false.

Yellowe testified that he paid Morgan for prescriptions. He brought her the necessary paperwork for patients but never brought patients to her. Yellowe

sold some of Morgan's prescriptions to Davies who provided records to the grand jury, including the billing paperwork associated with counts one through twelve of the indictment. The paperwork for seven of those counts was associated with the seven witnesses who provided their billing information to marketers. Yellowe identified Morgan's signature on the forms for counts one through twelve.

Morgan admitted to Scott that she had sold prescriptions to Yellowe and that she had not seen the patients. She admitted to Scott that she had been paid $40,000 by Yellowe. When Scott told her that millions of dollars had been paid on her physician number, Morgan told her, "I should have been paid more."

Morgan testified that she had signed some prescriptions without seeing patients and that the prescription forms associated with counts one through twelve were on her clinic's prescription form.

Viewing the evidence in the light most favorable to the verdict, a reasonable jury could have concluded beyond a reasonable doubt that Morgan had taken part in a scheme or artifice to defraud a health care benefit program. Based upon the testimony and documentary evidence, a reasonable jury could have concluded that Morgan had sold prescriptions for the purposes of billing Medicare without seeing patients and without being licensed in the state. Additionally, a reasonable jury could have concluded that Morgan conspired with Yellowe to defraud a health care benefit program.

### III. CONCLUSION

Morgan's conviction is AFFIRMED.