IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 2, 2008

Charles R. Fulbruge III
Clerk

No. 07-20503

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JUAN FERNANDO RIOS

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
4:06-CR-52-19

Before REAVLEY, JOLLY, and GARZA, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Juan Fernando Rios ("Rios") was convicted by a jury of his peers for conspiracy to possess with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 846, 841(a)(1) and (b)(1)(A)(viii). The District Court sentenced Rios to 292 months of imprisonment and a five-year period of supervised release. Rios now appeals his conviction and sentence. We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I

Since 2002, the Drug Enforcement Agency ("DEA") had been investigating a large-scale drug trafficking organization, which it believed was importing crystal methamphetamine ("meth" or "ice") from Mexico into the United States for distribution in areas including Texas. In December 2004, as part of this investigation, the DEA arranged for undercover agents to purchase meth from suspected dealers (a "buy-bust"). The buy-bust netted two pounds of meth and three meth dealers. One of the dealers ("Perez") cooperated with the DEA by providing telephone numbers for certain meth suppliers and placing phone calls to them. One of the suppliers that Perez contacted was Baldemar Eduardo Sanchez ("Sanchez"). The DEA thereafter placed wire intercepts on Sanchez's telephone. Through these intercepts, the DEA identified Luis Leal ("Leal") as a major supplier of meth coming out of Mexico. Over the course of its investigation, the DEA intercepted several thousand telephone calls.[1]

On March 16, 2005, the DEA intercepted two calls between Leal and Sanchez, during which they discussed the pick up and delivery of certain monies that Sanchez owed to Leal for the meth he had supplied. Leal explained that a close friend of his would pick up the money from Sanchez and would identify himself as "Johnny" or "Juan." Authorities later identified "Johnny" or "Juan" as Rios. Later that evening, the DEA intercepted a telephone call between Leal and a woman who indicated that Rios would pick up the money on the following day. That same night, the DEA intercepted a third call between Sanchez and Leal during which Sanchez informed Leal that Rios would pick up the money on March 17, 2005.

Rios called Sanchez twice on March 17, 2005. During these two telephone calls, Sanchez gave Rios directions to his house, told him that he would be

---

[1] All references to the substance or content of telephone conversations hereinafter come from wire intercepts that had been placed on various co-conspirators' telephones.

waiting, and they agreed to meet later that day. Through covert video surveillance of Sanchez's house on March 17, 2005, the DEA observed Rios arrive at Sanchez's home, go inside, and then leave. While Rios was in Sanchez's house, the DEA also observed one of his co-conspirators, Katie Bingaman ("Bingaman"), arrive at Sanchez's home. Later that evening, the DEA intercepted a telephone call between Sanchez and Leal during which Sanchez stated that he had given Rios $34,000 to deliver to Leal.

Approximately two months later, the District Court authorized the DEA to place wire intercepts on Rios's telephone during the period from May 25, 2005, through June 29, 2005. The DEA recorded intercepts during this time in which Rios discussed various other possible drug transactions, but the DEA did not record Rios discussing any transaction in connection with the instant meth conspiracy. The DEA ultimately arrested Rios in February 2006. Following Rios's arrest, the DEA played the recorded telephone calls between Sanchez and "Johnny" from March 17, 2005. Rios confirmed that "Johnny's" voice was his and that he had picked up money from Sanchez's house on that date.[2] Rios, however, denied knowing that the money had anything to do with meth.

Before trial, Rios moved to suppress recordings from the wire intercepts that were on his telephone during May 2005 and June 2005. Specifically, Rios argued that the DEA affidavit put forth in support of its application for the wiretaps was insufficient.[3] The District Court conducted a suppression hearing, held the affidavit to be sufficient, and denied Rios's motion. The recordings became a trial issue when, on cross-examination of DEA Special Agent Large ("SA Large"), defense counsel elicited testimony that Rios's voice had been recorded on only two of the approximately 6000 telephone calls that had been

---

[2] At trial, Sanchez confirmed that he had given Rios the proceeds from meth sales on March 17, 2005. Bingaman also confirmed that Rios had picked up the money from Sanchez.

[3] The relevant portions of the affidavit are set forth in Section II.A, infra.

intercepted from his co-conspirators. On redirect, the Government sought to have SA Large describe the content of the recordings from Rios's telephone, namely the possible drug transactions that were unrelated to the meth conspiracy. Rios objected. The District Court allowed the testimony under Fed. R. Evid. 404(b) as evidence of Rios's motive, intent, or knowledge with respect to the meth conspiracy.

The jury convicted Rios, and the District Court sentenced him to 292 months imprisonment with five years of supervised release. The PSR did not credit Rios with a safety valve or for acceptance of responsibility. Rios objected. The District Court overruled his objections and adopted the PSR. Also during sentencing, the Government described certain statements that Rios made during two separate proffer sessions concerning his extensive involvement in a marijuana conspiracy and his frequent role as a money carrier in drug transactions that were unrelated to the instant meth conspiracy. Rios objected that the Government had violated the proffer agreements, and the District Court made no ruling. Rios now appeals his conviction and sentence.

II

Rios contends that the District Court committed four errors in connection with his jury trial and sentencing: First, Rios argues that the District Court erred in denying his motion to suppress evidence obtained via wire intercepts on his telephone. Second, Rios argues that the District Court erred in admitting testimony, under Fed. R. Evid. 404(b), about certain wiretapped conversations during which Rios discussed possible drug transactions that were unrelated to the instant meth conspiracy. Third, Rios argues that the District Court erred in refusing to credit him with a safety valve or for acceptance of responsibility because the District Court misinterpreted Sections § 5C1.2 and § 3E1.1 of the United States Sentencing Guidelines ("Guidelines") or ("USSG"). Finally, Rios argues that the District Court erred at sentencing in considering certain

information concerning his other drug dealings that Plaintiff-Appellee ("Government") provided in breach of its two proffer agreements with Rios.

A

The first issue is whether the District Court erred in denying Rios's motion to suppress evidence obtained from wire intercepts on his telephones during the period of May 28, 2005, through June 28, 2005. The wire intercepts previously had been authorized by a District Court order on May 27, 2005. The Government and Rios agree that 18 U.S.C. §§ 2518(1)(c)[4] and (3)(c)[5] comprise the relevant prerequisites for obtaining a District Court order authorizing the wiretap in this case. Rios argues that the affidavit offered by the Government in support of its request for a District Court order authorizing the wiretap was insufficient to establish its necessity as required under Sections 2518(1)(c) and (3)(c). The Government argues that the affidavit was sufficient. We agree that the affidavit was sufficient.

---

[4] Section 2518(1)(c) provides:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter . . . shall include the following information:
>
> > (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

[5] Section 2518(3)(c) provides:

> Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving the interception of wire, oral, or electronic communications . . . if the judge determines on the basis of the facts submitted by the applicant that --
>
> > (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous.

We "review factual findings of a ruling on a motion to suppress for clear error and legal conclusions de novo." United States v. Moore, 452 F.3d 382, 386 (5th Cir. 2006). Because Rios only argues that "the affidavit submitted to obtain authorization to monitor [his] phone conversations was deficient," we review the District Court order authorizing the wiretap "for clear error." United States v. Tomblin, 46 F.3d 1369, 1376 (5th Cir. 1995).

We previously have interpreted Sections 2518(1)(c) and (3)(c) as only requiring a "showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." United States v. Krout, 66 F.3d 1420, 1424-25 (5th Cir. 1995) (quoting United States v. Alfonso, 552 F.2d 605, 612 (5th Cir. 1977). We held the affidavits in Krout to be adequate because they "asserted that informants or undercover agents could not infiltrate the conspiracy at high enough levels to obtain sufficient evidence to prosecute managers of the organization." 66 F.3d at 1425. In upholding the wiretaps at issue in Krout, we noted that we previously had affirmed wiretap orders based on similar affidavits. See id. (citing United States v. Guerra-Marez, 928 F.2d 665, 671 (5th Cir. 1991); United States v. Webster, 734 F.2d 1048, 1055 (5th Cir. 1984)). The affidavit at issue here is adequate under these cases: it describes a three-year DEA investigation of "an extensive network of drug traffickers" that had not yet "identified all the sources of supply" or "all of the individuals involved" or all "the locations used," despite the use of normal investigative techniques including physical surveillance, undercover agents, cooperating individuals, garbage extractions, subpoenas and search warrants, interviews, pen register analyses, financial investigations, and other wiretaps; it discusses the difficulties and dangers of using additional alternative investigative techniques, such as undercover agents, to infiltrate the upper levels of the organization; and it states that the DEA believes wiretapping Rios's telephone may yield this information

because he "appear[s] to have direct access to the sources of supply for the [meth]."  Accordingly, we find no clear error in the District Court order authorizing the wiretaps in this case.  See id.

B

The second issue is whether the District Court erred in allowing the Government to elicit testimony from SA Large on redirect, pursuant to Fed. R. Evid. 404(b),[6] relating to wiretapped conversations in which Rios discussed possible drug transactions that were unrelated to the instant meth conspiracy. Rios argues that the testimony was inadmissible because it was offered solely to prove his bad character, namely that he was the type of person who gets involved in drug conspiracies.  Rios also contends that the jury relied on this testimony, and therefore its admission substantially prejudiced his rights.  The Government counters that the District Court properly allowed this testimony to prove Rios's motive, intent, or knowledge at the time he picked up and delivered $34K in proceeds from certain drug sales.  We agree with the Government.

We review the District Court's evidentiary ruling allowing this testimony for abuse of discretion, subject to a harmless error analysis.  United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007).  The District Court ruling constitutes reversible error only if the admission of the testimony in question substantially prejudiced Rios's rights.  See id.    Thus, reversal is not required unless the

---

[6] Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon the request of the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

testimony was improperly admitted, and there is a reasonable probability that the improper testimony contributed to Rios's conviction.  See United States v. Mendoza-Medina, 346 F.3d 121, 127 (5th Cir. 2003).

We "employ[] a two-prong test to examine the admissibility of extrinsic evidence under Rule 404(b)."  United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007).  First, we determine whether the extrinsic evidence is relevant to an issue other than the defendant's character.  Id.  Second, we determine whether the evidence possesses a probative value that outweighs its prejudicial effect.  Id.  SA Large's testimony on redirect passes both tests.  Indeed, we were faced with a similar situation in United States v. Mortazavi, 702 F.2d 526, 528 (5th Cir. 1983).  In that case, we upheld the admissibility of extrinsic evidence concerning the defendant's previous drug dealings to rebut the defense that he lacked intent to deal drugs in relation to the crime charged.  See id.  This case is similar.  Rios's cross-examination of SA Large was intended to minimize his role in the conspiracy and to make the jury doubt whether Rios was aware that he was acting as a money courier in connection with a meth conspiracy.  The District Court allowed SA Large to testify on redirect about other drug conspiracies in which Rios was involved to rebut this defense by showing that Rios was an experienced drug dealer who knew what he was doing, i.e. participating in a meth conspiracy.  This extrinsic evidence was thus relevant to issues other than Rios's character))namely knowledge, intent, and absence of mistake or accident))all of which are permissible under Rule 404(b).  See id.  Considering that the District Court clearly instructed the jury as to the limited purpose of this evidence, we also hold that its probative value outweighs any possible prejudicial effect.  Accordingly, we hold that the District Court did not abuse its discretion in allowing SA Large to testify on redirect about wire intercept recordings relating to other drug conspiracies in which Rios was involved.  See id.

C

The third issue is whether the District Court erred at sentencing by refusing to credit Rios under the safety valve provisions in USSG § 5C1.2,[7] or for acceptance of responsibility under USSG § 3E1.1.[8] Rios argues that the District Court misinterpreted these provisions as being unavailable to Rios because he pled "not guilty" and proceeded to jury verdict. Rios also points out that he objected to the District Court's refusal to credit him under these provisions. Finally, Rios argues that he qualifies for a safety valve and for acceptance of responsibility because he never denied any of the Government's factual allegations at trial; his defense was based solely on a "sufficiency of the evidence" theory. The Government argues that the District Court properly denied Rios credit based on its factual findings that Rios did not cooperate with the government or accept responsibility for his criminal acts because Rios

---

[7] USSG § 5C1.2 (2006) provides, in relevant part:

> Except as provided in subsection (b), in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) set forth below: . . .
>
> > (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

[8] USSG § 3E1.1 (2006) provides, in relevant part: "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."

9

consistently sought to reduce his offense level by denying knowledge of the meth conspiracy and claiming only that he thought he was facilitating marijuana distribution or money laundering.

We review the District Court's application of the Guidelines de novo. United States v. Matias, 465 F.3d 169, 172 (2006). We review the District Court's findings of fact at sentencing for clear error. United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999). Unless we conclude that the District Court's factual findings are implausible in light of the record as a whole, we will not hold that they are clearly erroneous. Id.

The District Court never concluded that Rios was ineligible for a safety valve or for acceptance of responsibility simply because he exercised his right to a jury trial. Indeed, the District Court continually emphasized that Rios "had a perfect right to plead not guilty" and "an absolute right to go to trial." Accordingly, we find no error in the sentencing decision of the District Court. See Matias, 465 F.3d at 172.

D

The fourth issue is whether the District Court erred in considering certain information at sentencing, which the Government allegedly offered in breach of two proffer agreements with Rios; one was two weeks before trial, and the other was two weeks before sentencing. Without ever introducing evidence of the terms of either of these two proffer agreements and without ever describing the specific information that he claims the Government improperly offered, Rios contends that his sentence should be vacated and that he should be re-sentenced before a different district judge. The Government counters that it agreed only not to offer any information discussed during the first proffer at trial, not at sentencing. Regardless, the Government argues that the District Court did not consider any of the proffer-related information in deciding upon a sentence.

We conduct a de novo review of the legal question: whether the Government has breached its plea agreement with Rios. United States v. Brown, 328 F.3d 787, 790 (5th Cir. 2003). Here, we have no evidence before us concerning the terms of either of the proffer agreements at issue except for the Government's assertion during sentencing that the first proffer agreement provided only that proffer-related information could not be used as part of the Government's case-in-chief at trial. Therefore, Rios has not borne his burden of "demonstrating the underlying facts that establish breach by a preponderance of the evidence." See United States v. Price, 95 F.3d 364, 367 (5th Cir. 1996). Accordingly, we can reach no decision as to whether the Government breached the proffer agreement and can find no error in the sentencing decision of the District Court. See id.

III

For the foregoing reasons, we AFFIRM Rios's conviction and sentence. AFFIRMED.