# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 21, 2021

Lyle W. Cayce
Clerk

No. 19-11341

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

SAID AZZAM MOHAMAD RAHIM,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CR-169-1

Before HAYNES, GRAVES, and WILLETT, *Circuit Judges*.

PER CURIAM:*

Said Azzam Mohamad Rahim was convicted of conspiring and attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B, as well as making false statements to federal agents in violation of 18 U.S.C. § 1001. He was sentenced to 360 months of imprisonment. He challenges the sufficiency of the evidence on each

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 19-11341

conviction and asserts a violation of his Sixth Amendment right to confrontation. He also appeals his sentence. We AFFIRM.

## I. Background

In spring 2016, the FBI became aware of the internet-based application, Zello, amid suspicions that some of its users were utilizing the app as a means of supporting the Islamic State of Iraq and al-Sham ("ISIS"), an organization designated by the Secretary of State as a Foreign Terrorist Organization. *See* 69 Fed. Reg. 75587 (Dec. 17, 2004); *United States v. Khan*, 938 F.3d 713, 714 (5th Cir. 2019). Zello allows users to talk to other users walkie-talkie style. For instance, a user can talk to one person or broadcast to a channel—a group of up to 6,000 live users—by pushing a button and speaking. Only one person can talk at a time. Further, Zello users fall into one of several categories. Normal users may only listen to the channel, whereas a trusted user can speak on the channel. A moderator manages users by blocking, muting, or designating them as trusted users. An administrator, in addition to having a moderator's capabilities, can also designate users as moderators. While an administrator has substantial control over the channel, it cannot remove the channel, set the password, or assign users as administrators. Only the owner of the channel can do so.

From its investigation, the FBI discovered the existence of the "State of the Islamic Caliphate" channel on Zello, which had over 10,000 subscribers and was devoted to disseminating ISIS propaganda and recruiting followers. The channel had a "formalized structure," in which it was divided into three divisions—dialogue, information and media information, and administrative control—each of which had one or more administrators. The channel was open, so any Zello user could listen to its content.

No. 19-11341

Defendant/Appellant Said Azzam Mohamad Rahim ("Rahim"), a U.S. citizen, and Ibn Dawla[1] served on multiple committees of the channel and frequently conversed about delineating responsibilities and "spreading the message." Rahim served on the Coordination Committee and the Media Committee. He was also the "Emir" of the Dialogue Committee, which means leader and is considered a title of respect. He was regarded as an expert on ISIS by other users.

As an administrator and moderator on the channel, Rahim took over 2,000 administrative actions, such as designating, muting, and removing trusted users. Rahim strictly enforced the channel's rules, and those who disobeyed the rules suffered adverse consequences, such as being blocked or muted.

Rahim was also a frequent voice on the channel, often answering users' questions and giving lengthy sermons. According to expert testimony, Rahim "was somebody with fairly deep knowledge and understanding of ISIS, of its jargon, of its strategy, of its priorities, of its operations." He repeatedly invoked ISIS terminology and its leaders, including: (1) Abu Bakr al-Baghdadi ("al-Baghdadi"), the leader of ISIS; (2) Abu Mohammed al-Adnani ("al-Adnani"), the main spokesperson for ISIS; (3) the "Caliphate," which refers to the territory in Iraq and Syria that ISIS previously controlled and declared as an Islamic state; and (4) the "Caliph," a term used to described the leader of the Caliphate, and the self-proclaimed title of al-Baghdadi.

With an in-depth understanding of ISIS, Rahim focused his Zello activities on two objectives: recruiting fighters to travel to the Caliphate to

---

[1] Ibn Dawla's real name is Monour el Aoual, who was a Moroccan citizen living in Italy at the time.

join ISIS there, and inciting and counseling followers to commit terrorist attacks in ISIS's name in other countries. He encouraged listeners to "mobilize" to the Caliphate and "pledge allegiance" to al-Baghdadi. He boasted of the channel's role in recruiting followers for ISIS; Rahim once described a former user who expressed that he no longer wanted to be a "hypocrite" and ended up traveling to the Caliphate to join ISIS.

Rahim also encouraged those who could not travel to the Caliphate, even young children, to engage in terrorist attacks in their respective countries, saying: "[I]n every place where an unbelieving atheist exists, jihad is a duty. In any area where Christians exist, they are legal targets, or a Jew or atheist, or crusader, or where a Christian missionary preacher is . . . . All those are legal targets of the Islamic Caliphate State." He even took personal responsibility for the January 1, 2017 attack in Istanbul, Turkey: "[L]ess than a month [ago], I called upon the brothers, I mean, to target Turkey. . . . I ask God to grant me reward for it for inciting brothers to perform jihad for the cause of God."

Additionally, Rahim celebrated multiple terrorist attacks committed on behalf of ISIS. After the June 12, 2016 attack in Orlando, Florida, Rahim spoke on the channel: "[W]e rejoice for this attack which took place in America . . . Now starts the outreach activity at all mosques, especially in America, to publicize, to publicize this operation." After the July 14, 2016 attack in Nice, France, Rahim stated: "Oh man, now the French and all the Europeans are in [an] extreme state of terror. Everybody is living in fear. . . . I was really happy for this act. I was happy for this act, those dogs."

In early 2017, Rahim stopped speaking on the channel. On March 5, 2017, he arrived at the Dallas-Fort Worth International Airport to board a flight to Amman, Jordan. He last traveled to Jordan in 2010. He had with him $6,000 in cash, three SIM cards, two cell phones wiped of all social media,

No. 19-11341

his birth certificate, and his passport. As he approached the gate, FBI Special Agents Dwayne Golomb and Dan Glick asked to speak with him; Rahim voluntarily agreed.

The agents asked Rahim a series of questions, to which he answered no: (1) "Have you ever discussed with anyone travel for the purpose of jihad?"; (2) "Have you ever been a supporter of the Islamic State, ISIL, ISIS, Daesh?"; (3) "Have you ever promoted violence on behalf of the Islamic State, ISIS, ISIL, Daesh?"; (4) "Have you yourself ever encouraged anyone to follow [the] guidance of Abu Mohammed Al Adnani, including his instruction to kill infidels without consultation or permission?"; (5) "[H]ave you ever promoted an act of terrorism?"; and (6) "[H]ave you ever praised an act of terrorism?" Upon exiting the interview, Rahim was arrested for making false statements to the agents.

A grand jury charged Rahim with eight criminal counts in a second superseding indictment. Count One charged Rahim with conspiracy to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B; Count Two charged him with attempt to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B; and Counts Three through Eight charged him with making a false statement to a federal agency in violation of 18 U.S.C. § 1001.

The Government sought to introduce as evidence audio recordings of Rahim from the Zello app. The district court held a final pretrial conference, during which FBI Special Agent Matthew Fine, also Chief of the FBI's Data Intercept Technology Unit ("Unit"), testified about the collection of the audio recordings of Rahim for the purposes of authentication. Specifically, Special Agent Fine testified that the recordings were obtained by the FBI through its normal process of conducting electronic surveillance pursuant to

a court order: the Unit receives a court order; it reviews, validates, and authenticates the order; and then the order is generated into the system to begin electronic surveillance and data collection. During this process, a communication provider may be bound to deliver lawful intercept on behalf of the government through a court order, meaning that the data is collected by the communication provider and then provided to the FBI. During cross-examination, defense counsel was prevented from asking certain questions concerning specific details of the FBI's electronic surveillance program.

A four-day jury trial ensued, after which Rahim was found guilty on all counts. The Presentence Investigation Report ("PSR") applied a 2-level enhancement under U.S.S.G. § 2M5.3(b)(1)(E) and a 12-level terrorism enhancement under U.S.S.G. § 3A1.4. Based on a total offense level of 40 and a criminal history category of VI, the PSR calculated the applicable Guidelines range as 360 months (30 years) to 1,056 months (88 years) of imprisonment. Overruling Rahim's objections to the enhancements, the district court sentenced him to 360 months of imprisonment. Rahim timely appealed.

## II. Sufficiency of the Evidence

Rahim preserved his challenge to the sufficiency of the evidence by moving for a judgment of acquittal at the close of the Government's case. We review preserved challenges to the sufficiency of the evidence de novo, but with "substantial deference to the jury verdict." *United States v. Suarez*, 879 F.3d 626, 630 (5th Cir. 2018). A conviction must be affirmed "if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc).

No. 19-11341

### a. Count One (Conspiracy)

18 U.S.C. § 2339B makes it a crime to knowingly conspire to provide material support or resources to a foreign terrorist organization. A conspiracy is an agreement between two or more persons to join together to accomplish some unlawful purpose. *See United States v. Rothman*, 914 F.2d 708, 710 (5th Cir. 1990). The term "material support or resources" includes "service," which in turn includes "personnel."[2] 18 U.S.C. § 2339A(b)(1). Providing "personnel" means "to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control." *Id.* § 2339B(h). "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id.*

Rahim argues that his activities on Zello did not amount to providing material support to ISIS. He contends that he was "nothing more than a morally corrupt cheerleader," and that his statements were "merely idle banter" and "independent advocacy," thus constituting protected speech under the First Amendment. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 31–32 (2010) ("Independent advocacy that might be viewed as promoting the group's legitimacy is not covered [under § 2339B]."). We disagree. A rational jury could conclude that Rahim attempted to provide personnel to ISIS—that is, through Zello, he attempted to provide both himself and other individuals to work under ISIS's direction or control.

---

[2] 18 U.S.C. § 2339A(b)(1) defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."

Rahim was an active leader on the channel, often answering users' questions about ISIS, giving lengthy speeches, and taking various administrative actions. He repeatedly instructed users to join ISIS by either traveling to the Caliphate and fighting there, or committing attacks on behalf of ISIS in other countries. He even spoke of previous channel users who successfully "mobilized to the Caliphate" to fight for ISIS. He also outlined targets, such as Turkey, that fit ISIS's tactical and strategic goals. Rahim's devotion to carrying out ISIS propaganda and its recruiting agenda was not that of a mere sympathizer—his involvement in the channel permitted the growth of a community of ISIS followers, allowing them to mobilize and make the leap from talk to action. Thus, we conclude that a jury could reasonably infer that Rahim's activities on Zello amounted to an attempt to provide material support to ISIS. *See United States v. Hendricks*, 950 F.3d 348, 353–54 (6th Cir. 2020) (concluding that defendant operated under direction or for the benefit of ISIS where he viewed himself and his recruits as agents of ISIS, and disseminated to other ISIS members a document that he authored claiming responsibility for an attack and expressing allegiance to ISIS's leader).

Rahim also argues that no evidence established that he conspired with Dawla or other persons to provide material support to ISIS. He asserts that he was only chatting with "like-minded individuals" on Zello, and no "meeting of the minds" was proven by the Government. Again, we disagree. A rational jury could conclude that Rahim conspired with Dawla and others to provide personnel to ISIS. An agreement to conspire "may be inferred from a 'concert of action' or from 'the development and collocation of circumstances.'" *United States v. Bams*, 858 F.3d 937, 945 (5th Cir. 2017) (citation omitted). Rahim and Dawla collaborated on overseeing the channel, as they served on multiple committees together and frequently had conversations during which they would delegate responsibilities and strategize how to effectively mobilize ISIS followers. They worked together

to recruit followers; for instance, Dawla referred a potential recruit to Rahim for further counseling. Additionally, Rahim worked with others on the channel to recruit followers and promote ISIS propaganda; for example, he and three other people discussed which trusted users should speak more and reviewed their participation statistics (e.g., a user only spoke 21 times in six days). Thus, we conclude that a jury could reasonably infer that Rahim conspired with Dawla and other users on Zello to provide personnel—thus material support—to ISIS.

### b. Count Two (Attempt)

To prove attempt to provide material support to a terrorist organization, the Government must prove that Rahim (1) intended to provide material support or resources to ISIS, and (2) committed an act constituting a substantial step towards the commission of that crime and that strongly corroborates his criminal intent and amounts to more than mere preparation. 18 U.S.C. § 2339B; Fifth Circuit Pattern Jury Instructions (Criminal) § 1.34 (2019). Because we have already concluded that a reasonable jury could find that Rahim intended to provide material support to ISIS, we now address whether he took a "substantial step" toward providing material support.

A person takes a "substantial step" when he "purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *United States v. Hernandez-Galan*, 632 F.3d 192, 198 (5th Cir. 2011) (quoting MODEL PENAL CODE § 5.01(1)(c)). Rahim argues that his flight to Jordan cannot support the reasonable inference that he was traveling to recruit ISIS followers or fight for ISIS himself. We are not wholly convinced that Rahim was traveling to Jordan only to see his family—he was carrying a substantial amount of cash and his birth certificate, which is not needed for travel with a valid U.S.

passport. But even if his travel plans to Jordan do not constitute a substantial step, Rahim took a number of other substantial steps toward providing material support to ISIS, including: (1) being an active leader on the channel by leading and serving on committees, designating trusted users, and coordinating messages; (2) recruiting volunteers to travel to the Caliphate to join ISIS there; and (3) inciting and counseling users to commit attacks in other countries. These steps were not "mere preparation," but rather "conduct strongly corroborative of the firmness of the defendant's criminal intent." *United States v. Redd*, 355 F.3d 866, 873 (5th Cir. 2003) (citations omitted). Accordingly, a jury could reasonably conclude that Rahim attempted to provide material support to ISIS.

### c. Counts Three to Eight (False Statements)

A conviction under 18 U.S.C. § 1001 requires proof of five elements: "(1) a statement, that is (2) false (3) and material, (4) made with the requisite specific intent, and (5) within the purview of government agency jurisdiction." *United States v. Najera Jimenez*, 593 F.3d 391, 399 (5th Cir. 2010) (citations omitted). Rahim only disputes the materiality element.

In *United States v. Gaudin*, 515 U.S. 506, 512 (1995), the Supreme Court provided an analytical framework for determining the materiality of a false statement:

> Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to make?" The ultimate question: (c) "whether the statement was material to the decision," requires applying the legal standard of materiality . . . to these historical facts.

The legal standard of materiality is: "The statement must have 'a natural tendency to influence, or [be] capable of influencing, the decision of the

decisionmaking body to which it was addressed.'" *Id*. at 509 (citation omitted). But "[a]ctual influence or reliance by a government agency is not required. The statement may still be material even if it is ignored or never read by the agency receiving the misstatement." *Najera Jimenez*, 593 F.3d at 400 (internal quotation marks and citations omitted). "[T]he standard for a § 1001 violation is not whether the false statement actually influenced a government decision or even whether it probably influenced the decision; the standard is whether the misrepresentation was *capable* of influencing the agency decision." *Id.* (emphasis in original).

Rahim argues that his answers to the six questions were not material. The agents knew who he was, what he had said, where he was flying, and his thoughts on ISIS. The questions were merely a formality, and his answers did not influence the agents' decision in any way. The Government argues that his statements were material because they prevented agents from moving to follow-up questions that could have led to relevant information about ISIS, other individuals involved in terrorism, and potential terrorist operations.

As we explained above, it is not necessary to show actual influence. *Id.* It is clear that Rahim's statements were highly material: for example, whether or not he encouraged people to kill infidels is a highly material question to which he gave a false answer. But even if we did focus on influencing the government, there was evidence that Rahim actually did influence it. Special Agent Golomb—who, at the time of trial, had worked for the FBI for 15 years and primarily handled international terrorism investigations, specifically involving ISIS—testified at trial that knowing whether Rahim promoted or praised an act of terrorism could potentially allow the FBI to prevent future attacks and learn of other individuals who have supported or carried out attacks. We also recognize that an interviewee's denials that he had called for violence and was affiliated with ISIS have the capability of influencing a terrorism investigation because the government might turn attention away

from a serious threat or may be foreclosed from discovering additional information about ISIS and its members and supporters. Those false statements may also affect the government's decision to pursue criminal charges against the defendant or others.[3] Accordingly, a reasonable jury could conclude that Rahim made false statements to federal agents in violation of 18 U.S.C. § 1001.

## III. Limiting Cross-Examination

Rahim preserved his objection to the district court's limitation of his cross-examination of Special Agent Fine at the final pretrial conference. We review de novo a timely Confrontation Clause objection, subject to harmless error analysis. *United States v. Morgan*, 505 F.3d 332, 338 (5th Cir. 2007). A district court's limitation of cross-examination of a witness is reviewed for abuse of discretion. *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004). A district court's decision to admit evidence is also reviewed for abuse of discretion. *United States v. Gutierrez-Mendez*, 752 F.3d 418, 423 (5th Cir. 2014).

The Sixth Amendment's Confrontation Clause "gives the accused in a criminal prosecution the right to be confronted by the witnesses against

---

[3] *See United States v. Maxwell*, 820 F. App'x 298, 299–300 (5th Cir. 2020) (holding that a defendant's false statement that he did not attempt to commit a crime "had a natural tendency to affect the FBI's decision whether to pursue criminal corruption charges against [him] and also influenced the manner in which the FBI's investigation of [defendant] and others would proceed"); *United States v. Creel*, 458 F. App'x 413, 414 (5th Cir. 2012) (finding that a defendant's false denial that he was not at a certain location affiliated with a gang was capable of influencing the agency's determination of who leaked information to that gang and its decision "to include or exclude suspects or witnesses"); *see also United States v. Phillipos*, 849 F.3d 464, 473–74 (1st Cir. 2017) (false statements made to the FBI during informal interviews regarding a suspected terrorist's activities "frustrate[d] an ongoing terrorism investigation" and "deprived the agents of important corroborating information").

him." *Morgan*, 505 F.3d at 338. In *Crawford v. Washington*, the Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68 (2004). However, in *Morgan*, we addressed whether the use of grand jury testimony to authenticate the business records used against her at trial violated the Confrontation Clause. 505 F.3d at 337–38. We concluded that it did not, holding that "*Crawford* does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence." *Id.* at 339. We later recognized in *United States v. Bedoy*, 827 F.3d 495, 511 (5th Cir. 2016), that *Morgan* "held that *Crawford*'s strictures do not govern the preliminary determination of the admissibility of evidence under Federal Rule of Evidence 104(a)."

Rahim argues that his Sixth Amendment right was violated when the district court limited the scope of his cross-examination of Special Agent Fine, who was testifying at a final pretrial conference to authenticate audio recordings of Rahim. We disagree. The facts of this case are very similar to *Morgan*. The audio recordings were maintained like business records—Alex Gavrilov, Zello's Chief Technology Officer, testified at trial that the audio recordings were "kept in the regular course of business" and "made at or near the time of events that [they] record." Further, Special Agent Fine was testifying for the sole purpose of authenticating the recordings so that the district court could make a preliminary determination of their admissibility. Thus, we conclude that *Crawford*'s strictures do not apply to a district court's limitation of a pretrial cross-examination of a witness who was testifying only as to the authenticity of audio recordings, which were maintained like business records.

Further, the district court did not abuse its discretion in limiting the cross-examination of Special Agent Fine and admitting the audio recordings.

The district court reasonably prevented Rahim from asking questions that sought specific and potentially classified details about the FBI's electronic surveillance program. *See United States v. El-Mezain*, 664 F.3d 467, 521 (5th Cir. 2011) (observing that the Classified Information Procedures Act "imposes upon district courts a mandatory duty to prevent the disclosure of any classified materials"). Further, the audio recordings were properly authenticated and admitted. "Testimony that an item is what it is claimed to be" sufficiently satisfies the requirement for authentication. Fed. R. Evid. 901(b)(1). Special Agent Fine sufficiently explained how the recordings were obtained by the FBI through its normal process of conducting electronic surveillance pursuant to a court order. We conclude that the district court did not abuse its discretion in limiting the cross-examination of Special Agent Fine and admitting the audio recordings.

## IV. Reasonableness of Sentence

Following *United States v. Booker*, 543 U.S. 220 (2005), appellate review of sentencing decisions is limited to determining whether they are reasonable under the familiar abuse-of-discretion standard of review. *Gall v. United States*, 552 U.S. 38, 46 (2007). "Reasonableness has two parts: procedural and substantive reasonableness." *United States v. Rhine*, 637 F.3d 525, 527 (5th Cir. 2011).

### a. Procedural Reasonableness

Procedural reasonableness "requires that the district court calculate the Guidelines range, consider the § 3553(a) factors, and explain the sentencing decision." *Id.* at 528. The district court's interpretation or application of the Sentencing Guidelines is reviewed de novo and its factual findings for clear error. *United States v. Arayatanon*, 980 F.3d 444, 452 (5th Cir. 2020).

No. 19-11341

### i. 2-Level Enhancement Under U.S.S.G. § 2M5.3

Rahim challenges the 2-level enhancement under U.S.S.G. § 2M5.3(b)(1)(E), arguing that he was only charged with conspiracy and attempt to provide material support, and that it was never alleged nor proven at trial that he provided *actual* support to ISIS. Under U.S.S.G. § 2M5.3, a 2-level increase is applied if "the offense involved the provision of . . . material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." U.S.S.G. § 2M5.3(b)(1) (Special Offense Characteristic). The Sentencing Guidelines state that "specific offense characteristics" shall be determined on the basis of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Thus, the relevant conduct considered for the enhancement is not limited to the statutory elements that the Government had to prove at trial.

Sufficient evidence established that Rahim did in fact provide material support to ISIS with the intent that the support be used to commit a violent act. He actively spread ISIS propaganda, engaged in recruiting followers, and incited others to commit attacks on behalf of ISIS. We conclude that the district court did not err in applying the 2-level enhancement.

### ii. 12-Level Enhancement Under U.S.S.G. § 3A1.4

Rahim also challenges the 12-level terrorism enhancement under U.S.S.G. § 3A1.4, which states that if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," then 12 levels are added to a defendant's base offense level, and the criminal history category automatically becomes the maximum of VI. The term "federal crime of

15

terrorism" used in § 3A4.1 "has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." *See* U.S.S.G. § 3A1.4, cmt. n.1. Under 18 U.S.C. § 2332b(g)(5), an offense qualifies as a federal crime of terrorism if it is (1) "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," § 2332b(g)(5)(A); and (2) enumerated in § 2332b(g)(5)(B).

Rahim disputes the first requirement. He argues that no evidence established his "specific intent" to influence or affect a government or showed that his statements were "connected directly" to any act of terror, other than remarks about previous attacks. Assuming § 2332b(g)(5)(A) incorporates a specific intent requirement,[4] proving such intent "does not require proof of a defendant's particular motive," which is "concerned with the rationale for an actor's particular conduct." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). Rather, "'[c]alculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *Id.* Thus, the appropriate focus is "not . . . on the defendant, but on his 'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." *Id.*

The evidence clearly established that Rahim sought to influence and retaliate against the United States and other governments. He made a litany of statements explicitly calling for the destruction of "infidel countries" and urged users to commit violent attacks in the "legal targets of the Islamic Caliphate State." *See Khan*, 938 F.3d at 719 (noting that supporting ISIS,

---

[4] Though we have not expressly done so, many of our sister circuits have held that 18 U.S.C. § 2332b(g)(5)(A) incorporates a specific intent requirement. *See United States v. Ansberry*, 976 F.3d 1108, 1127 (10th Cir. 2020); *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020); *United States v. Hassan*, 742 F.3d 104, 148–49 (4th Cir. 2014); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014); *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014); *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009).

which is "an enemy of the United States," by "encouraging [another] to join ISIS and funding [another] in that mission, is some evidence that [a defendant's] conduct was calculated to influence or affect the conduct of the United States because ISIS's terrorist acts are intended to intimidate or coerce the United States").

Lastly, we reject Rahim's argument that whether he acted with specific intent should have been a question submitted to the jury and that the sentencing court's "extra judicial fact finding" of specific intent violated the Sixth Amendment. Traditional fact finding on relevant conduct, to the extent that it increases the discretionary sentencing range for a district judge under the Sentencing Guidelines, does not implicate the Sixth Amendment. *United States v. Hinojosa*, 749 F.3d 407, 412–13 (5th Cir. 2014); *see also United States v. Leontaritis*, 977 F.3d 447, 451 (5th Cir. 2020), *petition for cert. filed* (U.S. May 17, 2021) (No. 20-1614). ("We [have] . . . a clean division of labor: . . . sentencing within the statutory minimums and maximums following a guilty verdict and applying the Sentencing Guidelines is for the district judge to decide."). Accordingly, the 12-level enhancement was not procedural error.

### b. Substantive Reasonableness

Substantive reasonableness "depends on 'the totality of the circumstances, including the extent of any variance from the Guidelines range.'" *Rhine*, 637 F.3d at 528 (quoting *Gall*, 552 U.S. at 51). The substantive reasonableness of a sentence is reviewed for abuse of discretion. *Gall*, 552 U.S. at 51.

Rahim contends that his sentence is substantively unreasonable because he had no criminal history; the average sentence for ISIS-related convictions is 13.6 years; and he "simply engaged in rhetoric on a social media platform." The PSR calculated the Guidelines range as 360 months (30 years) to 1,056 months (88 years) of imprisonment, and the district court

sentenced Rahim to 360 months of imprisonment. Because the district court imposed a within-Guidelines sentence, it is "presumptively reasonable" and "accorded great deference on review." *United States v. Ochoa*, 977 F.3d 354, 357 (5th Cir. 2020). A defendant can rebut this presumption "only by showing that the sentence does not account for factors that should receive significant weight, gives significant weight to irrelevant or improper factors, or represents a clear error of judgment in balancing sentencing factors." *Id.*

We conclude that the district court imposed a substantively reasonable sentence. While it recognized that Rahim was "just being on the website" and that he was potentially traveling to Jordan to see his daughter, it also considered his statements exhibiting his violent nature and devotion to ISIS's mission, as well as his lack of acceptance of responsibility:

> There's so much hate out here, so much hate, and laughter at incredible harm. I mean 45 people, 80 people getting murdered, and you thought it was funny. And I don't think that's just talking on a radio station. I think that it's a lot more than that. . . .
>
> So all these facts, this hate, this mobilization towards the Islamic State, we just can't tolerate that in this country. This country has to stand up firm against terrorism and all of its factors.

Because the district court did not give undue or insufficient weight to any sentencing factors, we conclude that Rahim's sentence was substantively reasonable.

## V. Conclusion

For the foregoing reasons, we AFFIRM the conviction and sentence.